# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| TX DIRECT, LLC,            ) | |
|                            ) | |
|     Plaintiff,             ) | |
|                            ) | No. 2:22-cv-02685-TLP-tmp |
| v.                         ) | |
|                            ) | |
| FIRST DATA MERCHANT SERVICES ) | |
| LLC and WELLS FARGO BANK, N.A., ) | |
|                            ) | |
|     Defendants.            ) | |

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

Plaintiff TX Direct LLC ("TX Direct") is an independent sales organization that connects merchants who require credit card, underwriting, and fraud prevention services with financial institutions and sponsor banks. (ECF No. 24 at PageID 173–74.) TX Direct maintained a Merchant Program Processing Agreement ("the Agreement") with First Data Merchant Services ("FDMS") and Wells Fargo Bank, N.A., ("Wells Fargo") (jointly, "Defendants" and collectively, "the Parties"). (*Id.* at 175–76.) On September 19, 2022, Plaintiff discovered that it could no longer access a boarding portal for FDMS, and Plaintiff then sued for breach of contract and wrongful threats. (*Id.* at 171–72, 187.) Defendants now move to dismiss, asserting that no agreement existed between the parties on the date of the alleged breach. (*Id.* at 171.) After review, the Court **DENIES** Defendants' motion as to Count I, breach of contract, and **GRANTS** dismissal as to Count II, wrongful threats.

## **BACKGROUND**

Before the alleged breach, TX Direct had a contract for more than fifteen years with FDMS and for eight years with Wells Fargo.  In early 2007, TX Direct, FDMS, and non-defendant BancorpSouth Bank, entered into the first Agreement.  (ECF No. 25-1 at Page ID 196; ECF No. 25-4 at Page ID 260.)  In short, as an independent sales organization, TX Direct markets FDMS's credit card processing services for VISA and MasterCard to merchants. (ECF No. 24 at PageID 173–74.)  When the merchant agrees, TX Direct "on boards" the merchant through an electronic "boarding portal" to FDMS's credit card processing network. (*Id*.)

The Parties modified the Agreement over the years by adding amendments and replacing BancorpSouth Bank with Wells Fargo in 2014.  (ECF No. 25-2 at Page ID 234.) The Parties also amended the Agreement in December 2017: extending the Agreement's term until April 30, 2022, with automatic two-year renewals.  (ECF No. 25-7 at PageID 272.)  To avoid renewal, the Agreement required either the ISO (TX Direct) or the "Servicers" (FDMS and Wells Fargo)[1] to provide written notice of non-renewal 90 days before the expiration of the current term.  (*Id*.)

In mid-November 2021, FDMS's credit and risk manager informed TX Direct that it would conduct an audit of TX Direct's account.  (ECF No. 24 at Page ID 178.)  Eight days

---

[1] An independent sales organization (ISO) is a third-party that partners with banks to locate and manage merchant accounts on behalf of businesses, often in exchange for a fee or a percentage of the merchant's sales.  *Encyclopedia*, https://encyclopedia.com/economics/encyclopedias-almanacs-transcripts-and-maps/independent-sales-organization-iso (last visited Aug. 30, 2023).  A "servicer" is an agent or provider who engages with or assists a merchant in accepting credit-card transactions or assists the merchant in their performance under a merchant processing agreement.  *Law Insider,* https://www.lawinsider.com/dictionary/merchant-servicer (last visited Aug. 30, 2023).

later, FDMS's vice president and legal counsel added that renewal of the agreement hinged on TX Direct "passing" the audit. (*Id.* at 180.)[2]

Before the April 2022 deadline passed, the Parties orally extended the Agreement again. (ECF No. 24 at Page ID 180–83.) On April 27th, FDMS agreed to extend the expiration date until May 31st so the Parties could negotiate another agreement. (*Id.*) Three more extensions followed – May 26th, June 15th, and, June 24th, when FDMS extended the agreement to July 15. (*Id.*)

At the beginning of August 2022, the Parties amended the Agreement ("the Amendment"). (*Id.* at PageID 183–84.) The Amendment has six sections and refers to the Agreement dated December 28, 2017. (ECF No. 25-8 at Page ID 279.) Section 6 specifies that if the terms of the Amendment and the Agreement conflict, the Amendment will control. (*Id.* at PageID 282.) Yet it also says that all other terms of the Agreement "will remain in full force and effect." (*Id.*)

According to Section 4.1, the Amendment's terms began on the date when the last party signed, and they will continue until the expiration or termination of the Agreement. (*Id.* at PageID 281.) Neither Plaintiff nor Defendants claim that the Amendment allowed either Party to terminate the Agreement at will or that it nullified the Agreement. (*See* ECF Nos. 32-1, 33, 35-1, 39-1, 39-2.) A month later, on September 19, 2022, Plaintiff lost access to the "boarding portal" through which it completed applications and agreements for new merchants. (ECF No 24 at PageID 187.)

---

[2] Though on May 17, 2022, Defendants allegedly notified TX Direct that it "passed the audit by remediating the grounds on which FDMS had purposed that it would not renew the [ ] Agreement." (ECF No. 32-1 at PageID 334.)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move for the dismissal of a complaint based on a party's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Accepting all well-pleaded allegations in the complaint as true, the court 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 570 (2007)).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff . . . and draw all reasonable inferences in favor of the plaintiff." *Wamer v. University of Toledo*, 27 F.4th 461, 466 (6th Cir.), *cert. denied*, 214 L. Ed. 2d 253 (2022) (citation omitted). To meet the plausibility standard, "the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Sixth Circuit has also ruled that a court may consider a document that is attached to the complaint in evaluating whether dismissal of the action is proper. *Williams v. CitiMortgage, Inc.*, 498 Fed. Appx. 532, 536 (6th Cir. 2012) (per curiam); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). As for allegations over a

contract, the language of the contract itself will control over allegations in the complaint. *Williams*, 498 Fed. Appx. at 536 ("When a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations") (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (stating that this rule is "well-settled")).

## ANALYSIS

Defendants' motion and reply make two overarching arguments: (1) that, because it gave notice of non-renewal, the contract ended before they allegedly breached it, and (2) that Plaintiff knew it no longer had a contract with Defendants. (ECF No. 28-1 at PageID 293–94, 299–300; ECF No. 33 at PageID 361.) In response, Plaintiff advances three theories: 1) that the Agreement never ended because Defendants did not give proper notice of non-renewal, 2) that Defendants ratified the Agreement through their conduct, or 3) in the alternative, that the Parties' conduct created an implied contract. (ECF No. 32-1 at PageID 336–37, 345–48, 350–52.) This Court will address each argument in turn but will begin with the Agreement's governing law and its application.

### I. New York Law Governs the Agreement

There is no dispute that New York law governs the Agreement and that this Court should look to that law in construing the Agreement. (ECF No. 25-1 at PageID 224; and *see* ECF Nos. 28-1 at PageID 296–98, 35-1 at PageID 375–79.) New York Law adheres to the common-law rule that when evaluating a contract at the motion to dismiss stage, a court determines the parties' objectives through the contract's language. *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *accord, Care Travel Co. v. Pan American World Airways, Inc.,* 944 F.2d 983, 987 (2d Cir.1991).

5

Under New York law[3] a court also maintains the initial interpretation of a contract. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (internal citations and quotation marks omitted). This means that the substance and effect of the contract is "a matter of law for the court to decide." *Lamourex v. Trustco Bank*, 592 F. Supp. 3d 14, 27 (N.D.N.Y. 2022). The Court's objective during this initial review is to determine the intent of the parties *solely* through the language found in the contract. *Wells Fargo Bank, Nat. Ass'n v. Davidson Kempner Cap. Mgmt. LLC*, 32 F. Supp. 3d 436, 441 (S.D.N.Y. 2014) (quoting *Consolidated Edison, Inc. v. Northeast Util*., 426 F3d 524, 527 (2d. Cir. 2005). And the key question is whether the contract's terms are ambiguous. *See Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000).

If the contract's terms are clear and unambiguous, a court may dismiss at the Rule 12(b)(6) stage. *See, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008) (summary order). But a court may not grant a motion to dismiss if a material contractual term is ambiguous because all such ambiguities are to be resolved in favor of the plaintiff at this stage. *Readick v. Avis Budget Grp., Inc.*, No. 12 Civ. 3988 (PGG), 2013 WL 3388225, at *4 (S.D.N.Y. July 3, 2013) ; *See, e.g., Vectron Int'l, Inc. v. Corning*

---

[3] The Parties argue over the use of "and" in determining whether FDMS and Wells Fargo, defined as the "Servicers" must be read conjunctively or disjunctively. Defendants rely exclusively on *Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, a preliminary injunction denial, to argue that the Second Circuit allows for the word "and" to also include the singular. 832 F.App'x 723 (2d Cir. 2020). But *Spanksi* is equivocal at best. In *Spanski*, the court upheld the conjunctive meaning for the word "and" within an extension clause of a Polish contract that applied New York Law ("the use of the word "and" in the context of Section 10.1 is unambiguous and that it has its usual conjunctive meaning.") *Id*. at 725. The Court concluded that both parties must agree to renewing a contract for another ten years. *Id*. Defendants advance a roundabout argument from *Spanksi's* holding, arguing that only one party should then have to provide a notice of non-renewal because it would be unfair if one party "could bind the other in perpetuity…" (ECF No. 28-1 at PageID 298.)

6

*Oak Holding, Inc.*, 964 N.Y.S.2d 724 (2013) ("[I]n the context of a motion to dismiss, if the contract's language is ambiguous, then the motion must be denied to permit the parties to discover and present extrinsic evidence of the parties' intent.")

Finally, New York law sets a higher bar for sophisticated contracting parties. *See BDC Finance L.L.C. v. Barclays Bank PLC*, 974 N.Y.S.2d 39 (1st Dep't 2013); *Mercury Partners LLC v. Pacific Medical Bldgs., L.P.*, 2007 WL 2197830, *14 (S.D. N.Y. 2007). When experienced personnel negotiate a contract, a court should read it according to those terms. *See Ashwood Capital, Inc. v. OTG Management, Inc.*, 948 N.Y.S.2d 292 (1st Dep't 2012); *Civil Service Employees Ass'n, Inc. v. Plainedge Union Free School Dist.*, 786 N.Y.S.2d 59 (2d Dep't 2004). The Parties here are sophisticated entities with legal counsel and the Court will hold them to this higher bar.

## II. Non-Renewal Language and the Term Servicers

Defendants claim that because they provided notice of non-renewal, the Agreement ended on April 30, 2022. (ECF No. 28-1 at PageID 296–98.) Plaintiff counters that the Agreement required *both* Defendants – FDMS and Wells Fargo – to issue the non-renewal notice. Because only FDMS gave notice, the Agreement never ended. (ECF No. 32-1 at PageID 336–37.) And the Parties remained contractually bound. (*Id.*)

### A. The Parties' Analysis of the Non-renewal Language and the Term Servicers

The Court will now summarize the positions of the parties. Section 10.1 of the 2017 renewal Amendment set the Agreement's term limits. And it provided that the Agreement would successively renew for two years on April 30, 2022, unless "the ISO or Servicers give written notice of non-renewal." (ECF No. 25-7 at PageID 272.) Under the original 2007 Agreement, the term "Servicers" *collectively* referred to both FDMS and the sponsor bank.

(ECF No 25-1 at PageID 217.)  Plaintiff argues that by using the word "Servicers"—the collective term for both FDMS and the bank—the contract required both FDMS and Wells Fargo to provide notice of non-renewal.  (ECF No. 24 at PageID 190–91.)  That said, section 12.13 of the Agreement titled "Construction" says that "the singular shall include the plural and the plural shall include the singular."  (ECF No 25-1 at PageID 224.)

Reading further in the 2017 renewal Amendment, Section 10.2, entitled "Termination by Servicers," states that *either* "First Data or Bank may terminate this Agreement prior to its expiration *for cause* upon prior written notice to ISO."  (ECF No 25-7 at PageID 272–73) (emphasis added.)  So the 2017 Amendment distinguishes between which parties must give notice for non-renewal and for termination—the termination clause identifies either FDMS or Wells Fargo as separate entities while the non-renewal clause uses the term "Servicers" for both entities collectively.  (*Id*.)

Nothing prevents the Parties from referring to FDMS and Wells Fargo collectively as "Servicers" for brevity.  (*See* ECF No. 25-1 at PageID 197).  And perhaps they intended to allow either FDMS or Wells Fargo to issue a non-renewal notice, in the same manner as the termination clause in Section 10.2.  (See ECF No. 25-7 at PageID 272–73.)  But at the motion to dismiss stage, the well-pled factual allegations are viewed in the light most favorable to Plaintiff.  *Cates v. Crystal Clear Techs., LLC,* 874 F.3d 530, 534 (6th Cir. 2017).  So even though both interpretations—that "Servicers" refers to FDMS and Wells Fargo collectively or as individual entities—seem to be reasonable interpretations of the contract, the Court must defer to the non-moving party's interpretation at the dismissal stage.

B.     **Interpretation of an Ambiguous Contract**

A contract is unambiguous if the language used has a definite meaning that could not be misinterpreted nor is there a reasonable basis for a different opinion. *See Selective Ins. Co. of America v. County of Rensselaer,* 26 N.Y.3d 649, (2016). If a court finds that the contract's term is unambiguous it will assign the "plain and ordinary meaning to each term." *D.C. USA Operating Co., LLC v. Indian Harbor Ins. Co.*, 07 Civ. 116, 2007 WL 945016, at *7 (S.D.N.Y. Mar. 27, 2007).

Also, New York law adheres to the plain meaning rule: what is stated clearly is to be applied clearly. *International Multifoods Corp. v. Commercial Union Ins. Co.,* 98 F. Supp. 2d 498, 503 (S.D. N.Y. 2000), *vacated on other grounds and remanded*, 309 F.3d 76 (2d Cir. 2002). While a court should not assume that a party willingly placed itself at the mercy of another, *see Hyatt Corp. v. Women's Intern. Bowling Congress, Inc.*, 80 F. Supp. 2d 88, 96 (W.D.N.Y. 1999), a court also cannot re-write or alter the terms in an agreement nor "strain language beyond its reasonable and ordinary meaning." *Shaw Grp. Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 124 (2d Cir. 2003). It is not the court's function to modify an agreement after the fact—what is written must be enforced. *See Andron v. Libby,* 993 N.Y.S. 2d 272 (1st Dep't 2014).

The Court finds that the term "Servicers" in Section 10.1 of the Agreement is ambiguous in the context of the non-renewal provision because both Parties advance reasonable interpretations of its meaning. Under New York law, a term is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular

9

trade or business." *Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 404 (S.D.N.Y. 2000) (quoting *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095 (2d Cir. 1993). The Agreement referred to "Servicers" as *both* FDMS and Wells Fargo collectively but included different requirements for non-renewal and termination—termination requires only one party to give notice while non-renewal requires the notice from "Servicers." (ECF No. 25-7 at PageID 272–73.) It is reasonable to read that Section 10.1 requires both FDMS and Wells Fargo to issue notice of non-renewal, and it is also reasonable to read that it only requires one party. This Court then cannot apply the plain meaning of the word "Servicers" to Section 10.1 because there are two differing, but sound interpretations of this term.

As stated above, ambiguous terms with alternative meanings are unsuitable for a motion to dismiss. *See e.g., Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 30 (N.D.N.Y. 2022) (holding that language in the account disclosure notice, specifically addressing overdraft fees, is material and ambiguous). A court must also read the ambiguous term within the context of the entire contract. *Sayers* 7 F.3d at 1095 (holding that the contract is ambiguous because both parties offered reasonable interpretations of the contract's benefit-termination provisions).

Like the litigants in *Sayers*, both Parties offer a sound interpretation for the critical term in Section 10.1 of the contract—here "Servicers." It is not readily apparent whether this term refers to FDMS and Wells Fargo collectively or individually. For these reasons, the Court finds that at this stage it cannot dismiss, and this matter should proceed to the discovery phase. See *K. Bell & Assocs. V. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citing *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir. 1993)).

### III. The Parties Ratified the Agreement

At this stage, the Court finds there is enough evidence to infer that the parties ratified the Agreement. Defendants contend that Plaintiff knew that the Agreement had expired before they allegedly ratified it. (ECF No. 28-1 at PageID 299.) Plaintiff responds that the Parties' conduct; namely, the four separate extensions of the Agreement, the continued onboarding of merchants, and the August Amendment amount to continued performance and later ratification. (ECF No. 32-1 at PageID 346.) This Court agrees with Plaintiff.

Even when a party communicates a non-renewal notice, if they act to the contrary, they can extend the life of a contract. For example, "where a contract expires by its terms but the parties continue to perform as before, an implication may arise that they have mutually assented to a new contract containing the same provisions as the old." *Martin v. Campanaro*, 156 F.2d 127, 129 (C.C.A. 2d Cir. 1946). To evaluate whether the parties agreed to a new agreement as they continued to perform, "the courts look to the conduct of the parties to determine whether the terms of the written contract continue to apply." *Richmor Aviation, Inc. v. Sportsflight Air, Inc.,* 918 N.Y.S. 2d 806, 808 (2011).

Even if Defendants intended not to renew the contract, their behavior suggested they wanted to keep the deal going. For instance, they agreed to extensions every month, they approved the onboarding of new merchants, and they signed an amendment that incorporated the terms of the latest Agreement. In fact, Defendants cited *Richmor Aviation,* but then failed to argue why the Parties' conduct differed from the normal course of performance under the Agreement. (ECF No. 28-1 at PageID 300.) And neither Party pleaded that the Agreement could be terminated at will or that this August Amendment served a purpose different from

the Parties' normal course of conduct. Accepting Plaintiff's factual allegations as true, a plausible conclusion is that the Parties ratified the agreement through their conduct.

Under New York law, ratification occurs when a party intentionally accepts benefits under the contract and by "remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *In re Marketxt Holdings Corp.,* 361 B.R. 369, 402 (Bankr. S.D.N.Y. 2007) (citations omitted). Taking Plaintiff's allegations of fact as true, Defendants had every opportunity to repudiate performance, but they did not. Defendants do not claim that they were coerced, threatened, or tricked into granting extensions, amending the Agreement, or allowing TX Direct to onboard merchants. Instead, Defendants appear to have accepted the benefits of this contractual relationship.

Defendants' only counter to the ratification allegation is that Plaintiff knew the Parties were no longer contractually bound. (*See* ECF No. 33 at PageID 361.) They exclusively cite Plaintiff's amended complaint, specifically sections 33–35 and 46, claiming that Plaintiff "pleaded itself out of this argument." (ECF No. 28-1 at PageID 299.) But these sections only recite how the Parties extended the Agreement and that Defendants contend "between January 28, 2022, and September 23, 2022, that the Processing Agreement had not renewed." (ECF No. 24 at PageID 10–12, 14–15.)

Even if Defendants told Plaintiff that the Agreement did not renew, Defendants' conduct – allowing the onboarding of new merchants, entering into extensions of the Agreement, and signing the August Amendment – conflict with that statement. *See Taussig v. Clipper Group, L.P.,* N.Y.S.2d 10, 11 (2004) ("where factual allegations or legal conclusions are flatly contradicted by documentary evidence, they are not presumed to be true, or even

12

accorded favorable inference"). Defendants neither deny, nor explain why, they continued to onboard merchants and signed the August amendment. As stated, the Defendants' sole argument is that Plaintiff knew that the contract did not renew, and the only support they provide is from Plaintiff's complaint. (*See* ECF No. 28-1 at PageID 299 ; ECF No. 33 at PageID 360–61.) The Court finds that Plaintiff's argument that Defendants ratified the contract is plausible at this stage.

## IV. The Parties' Conduct could also Support an Implied Contract

Because this Court finds, under Rule 12(b)(6) and accepting Plaintiff's allegations as true, that an Agreement existed during the time of the alleged breach, it need not address Plaintiff's third reason to deny the motion—that the Parties' conduct created an implied contract. (*See* ECF No. 32-1 at PageID 350–53.) A contract cannot be both expressly determined and implied in fact. *Saeed v. Kreutz*, 606 F. App'x 595, 597 (2d Cir. 2015) (quotations omitted). And, as stated above, the Court finds enough evidence that a contract existed between the Parties at the time of the alleged breach.

Under New York law, to find an implied contract, courts look to the parties' conduct, rather than their words, as evidence of intent to be bound. *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264 (S.D.N.Y. 2021). A court may also find an implied contract when a party began performance and if the parties left terms open, anticipating further negotiations. *See Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 831 (2d Cir. 2019). Given these standards, even if the Court did not find that an agreement existed (and absent an amendment to the Agreement), the Court would likely find that the Parties' continued extensions and onboarding of merchants would suggest an implied contract.

## V.     Wrongful Threats

The Court will briefly address the wrongful threats claim that Plaintiff raised in its amended Complaint.  Plaintiff's amended Complaint lists two causes of action: breach of contract and wrongful threats.  (ECF No. 24 at PageID 192–93.)  But Plaintiff stated in its amended Response Motion (ECF No. 32-1 at PageID 354) that it would seek Defendants' consent to remove this cause of action under FRCP 15(a)(2).  (*Id.*)  Yet there is no sign that this occurred.

In their Motion to Dismiss, Defendants note that "wrongful threats" is an element of an economic duress claim and not a separate cause of action.  (ECF No. 28-1 at PageID 300–01.)  The requirements for economic duress are 1) a wrongful threat and 2) the plaintiff's deprivation of her free will.  *Zuckerman v. Metro. Museum of Art*, 307 F. Supp. 3d 304, 319 (S.D.N.Y. 2018) *aff'd,* 928 F.3d 186 (2d Cir. 2019).  Plaintiff's amended Complaint does not allege enough facts to plausibly satisfy either of these prongs.  As a result, the Court Grants Defendant's motion to dismiss this claim.

## CONCLUSION

For all these reasons, the Court **DENIES** Defendants' Motion to Dismiss Count I, breach of contract, but **GRANTS** the motion as to Count II, wrongful threats.

**SO ORDERED**, this 21st day of September, 2023.

                                                s/Thomas L. Parker
                                                THOMAS L. PARKER
                                                UNITED STATES DISTRICT JUDGE