**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| TX DIRECT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:22-cv-02685-TLP-tmp |
| v. | ) | |
| | ) | |
| FIRST DATA MERCHANT SERVICES | ) | |
| LLC and WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Plaintiff TX Direct, LLC ("TX Direct") sued First Data Merchant Services LLC ("First Data") and Wells Fargo Bank, N.A. ("Wells Fargo") for breach of contract. (ECF No. 92.) And First Data and Wells Fargo (collectively, "Defendants") brought counterclaims against TX Direct for breach of contract, fraud, and negligent misrepresentation.[1] (ECF Nos. 93, 94.)

Defendants move for summary judgment on two claims ("Motion for Summary Judgment"): TX Direct's breach of contract claim and Defendants' breach of contract counterclaim. (ECF No. 125.) TX Direct responded in opposition. (ECF No. 131.) Defendants replied, and TX Direct filed a surreply. (ECF No. 135, 136.)

---

[1] Defendants brought the negligent misrepresentation claims in the alternative to the fraud claims. (ECF Nos. 93, 94.)

1

## BACKGROUND

**I.    The Parties' Roles, the Wholesale Agreement, and the Program Standards**

This case is a dispute among participants in the credit card payment processing system—TX Direct, an independent sales organization ("ISO"), First Data, a processor, and Wells Fargo, an acquiring bank.  Understanding the roles of the "acquiring bank," "processor," and "ISO," is helpful in analyzing the Motion for Summary Judgment.[2]  A merchant wishing to accept debit or credit cards must have a merchant account with an acquiring bank ("acquirer") that has relationships with credit card networks like Visa and Mastercard.  (ECF No. 131-1 at PageID 3757.)  To process the card transactions, the acquirer often enters a contract with a "processor." (*Id.* at PageID 3758.)  Under this system, the processor performs the technical aspects of processing debit or credit card transactions and provides the infrastructure necessary to conduct bank-to-bank transfers.  (*Id.*)  In turn, the processor and acquirer enter contracts with ISOs.  (*Id.*) And the ISOs, like TX Direct, solicit and sign-up (in other words "board") new merchants for merchant accounts with processors and acquirers.  (*Id.*)

In 2007, TX Direct (the ISO), First Data (the processor), and BancorpSouth (the acquirer) entered into a Merchant Program Processing Agreement ("Wholesale Agreement").  (ECF No.

---

[2] Defendants, through the Declaration of Erik Nicholson (a vice president of First Data's parent company), have provided basic information about acquiring banks, processors, and ISOs, which the Court sets out in this Section.  (ECF No. 125-2 at PageID 2041; ECF No. 125-3.)  TX Direct does not dispute the accuracy of this information.  But TX Direct does object to the relevance of these explanations, arguing that as much as the explanations purport "to define industry standards," they are "not appropriately considered in connection with Defendants' Motion for Summary Judgment."  (ECF No. 131-1 at PageID 3758.)  But the Court disagrees.  The Court does not view Defendants as trying to define industry standards here.  Rather, this is basic information about the setup of the credit card payment processing system that is needed to understand the issues here.

125-6.)  BancorpSouth later assigned the Wholesale Agreement to Wells Fargo. [3]  (ECF No. 92 at PageID 943; ECF No. 95 at PageID 1102; ECF No. 96 at PageID 1299.)  And, over the years, TX Direct, First Data, and Wells Fargo amended the Wholesale Agreement many times.  (*See, e.g.*, ECF No. 125-20.)  Pertinent to this Order, the Parties amended the Wholesale Agreement in 2017 ("2017 Amendment").  (ECF No. 125-21.)

Under the Wholesale Agreement, TX Direct agreed to serve as a Wholesale ISO of First Data and Wells Fargo.  (ECF No. 131-1 at PageID 3761, 3763; *see* ECF No. 125-6 at PageID 2288.)  As a Wholesale ISO, TX Direct agreed to sell First Data and Wells Fargo's processing services to new merchants, complete initial credit reviews of all new merchants, underwrite all new merchants, and monitor existing merchants in TX Direct's portfolio.  (ECF No. 131-1 at PageID 3761.)  And the merchants TX Direct added became part of TX Direct's portfolio, which is sometimes called its "Wholesale Portfolio."  (*See id.* at PageID 3763; ECF No. 125-6 at PageID 2288.)

During its time as a Wholesale ISO of Defendants, TX Direct never communicated or interacted with Wells Fargo.  (ECF No. 131-1 at PageID 3761.)  Indeed, TX Direct did not have a customer contact at Wells Fargo.  (*Id.*)  And TX Direct did not negotiate the Wholesale Agreement or any of its amendments with Wells Fargo.  (*Id.* at PageID 3762.)  In sum, between Wells Fargo and First Data, TX Direct interacted only with First Data.  (*Id.*)

---

[3] The Parties do not explain this assignment in their briefs on the Motion for Summary Judgment or statements of undisputed facts.  So the Court looked to the pleadings in this case, and the Parties all agree that Wells Fargo was part of this contract as the assignee of BancorpSouth Bank.

## II.    The Wholesale Agreement and the Program Standards: Specific Responsibilities

As part of the Wholesale Agreement, TX Direct agreed to follow First Data's Wholesale ISO Program Standards ("Program Standards").  (ECF No. 131-1 at PageID 3761.)  And under the Wholesale Agreement and the Program Standards, TX Direct had to collect a Merchant Processing Agreement, Program Guide Confirmation Page, and bank account verification information (collectively, "Merchant Application Materials") for each new merchant it boarded. (*Id.* at PageID 3762; ECF No. 125-6 at PageID 2295; ECF No. 125-9 at PageID 2791–92.)  The Wholesale Agreement then required TX Direct to "forward" the Merchant Application Materials "to SERVICERS or to any other place(s) as SERVICERS may designate for processing and document storage."  (ECF No. 131-1 at PageID 3763; ECF No. 125-6 at PageID 2295.)  And the Program Standards provided where TX Direct needed to send the Merchant Application Materials.  (ECF No. 131-1 at PageID 3763.)

Under the Program Standards, TX Direct needed to submit Merchant Application Materials to First Data through AccessOne—a First Data system used to board new merchants onto First Data's payment processing platform.  (*Id.*; ECF No. 125-9 at PageID 2791.)  If TX Direct did not use AccessOne to board a new merchant, the Program Standards allowed TX Direct to seek a "temporary exception," which first had to "be pre-vetted and approved by First Data."  (ECF No. 125-9 at PageID 2792.)  TX Direct never sought any temporary exception to upload Merchant Application Materials in a way other than the Program Standards describe. (ECF No. 131-1 at PageID 3768.)

Also under the Program Standards, TX Direct had to submit Merchant Application Materials to First Data within three business days of boarding new merchants.  (ECF No. 125-9 at PageID 2792.)  This was true "[r]egardless of the method of transmission."  (*Id.*)  In the event

4

TX Direct breached the Program Standards, TX Direct agreed to forfeit "its rights to be paid residuals associated with that merchant," and to "be responsible to pay First Data the amount of any fines, fees, penalties, assessments or any other financial loss incurred by First Data or Bank related to such merchant account(s)." (*Id.* at PageID 2768.)

Before submitting the Merchant Application Materials to First Data using AccessOne, TX Direct had to perform initial credit reviews and underwriting for each new merchant. (ECF No. 131-1 at PageID 3766.) Also before submitting the Merchant Application Materials, TX Direct used a third-party system to generate a unique merchant identification number ("MID") for each new merchant. (*Id.* at PageID 3763.) The Parties dispute whether First Data required that TX Direct include a new MID on the Merchant Application Materials for each new merchant at the time of boarding. (*Id.* at PageID 3764.) The Parties likewise dispute whether each merchant needs a MID to process on First Data's systems. (*Id.*)

Once TX Direct uploaded Merchant Application Materials for a new merchant, AccessOne created a profile for that merchant. (*Id.* at PageID 3765.) The profile was linked to the merchant's MID and included the Merchant Application Materials. (*Id.*) The profile would also include other information like when TX Direct boarded the merchant; the merchant category code (i.e., retail or restaurant); and the merchant's tax identification number, owner, physical address, and direct deposit account. (*Id.*) And TX Direct could edit the profile in the event a merchant's information changed. (*Id.* at PageID 3766.)

Importantly, Defendants also had responsibilities under the Wholesale Agreement. For example, Defendants had to check TX Direct's merchants against the Terminated Merchant File, the Member Alert to Control High-Risk Merchants (MATCH) list, and similar lists. (ECF No. 125-6 at PageID 2295.) Also under the Wholesale Agreement, Defendants held "the sole right

and authority to accept or reject" any merchant application.  (*Id.*)  Likewise, Defendants could

require TX Direct to terminate a merchant in its portfolio.  (*Id.*)

### III.    Issues Arise

Now that the Court has set out the basics of the Wholesale Agreement, Program

Standards, and the Parties' roles under those agreements, the Court will describe various issues

that arose between the Parties in 2020 and 2021.

#### A.    Unqualified Merchants

In late 2020, First Data identified merchants in TX Direct's portfolio that First Data

believed were either unqualified or prohibited under the Program Standards and asked TX Direct

to terminate them.  (ECF No. 131-1 at PageID 3770; *see* ECF No. 125-11.)  After a year had

passed, TX Direct still had not terminated these merchants.  (ECF No. 131-1 at PageID 3770.)

And so First Data sent TX Direct a Notice of Termination dated September 13, 2021, requiring

TX Direct to terminate these merchant relationships.  (*Id.* at PageID 3770–71; ECF No. 125-12

at PageID 2852–53.)  Wells Fargo did not sign the Notice, and First Data did not indicate that it

was signing on behalf of Wells Fargo.  (ECF No. 131-1 at PageID 3770–71; *see* ECF No. 125-12

at PageID 2852–53.)  In response to the Notice, TX Direct moved the merchants to another

processor without complaint.  (ECF No. 131-1 at PageID 3771–72.)

#### B.    Fraudulent Transactions

Also in late 2020, TX Direct ran into issues with a merchant.  The Parties describe these

issues differently.  According to Defendants, a merchant claimed it had experienced fraudulent

transactions.  (ECF No. 125-2 at PageID 2047–48.)  But TX Direct disputed the merchant's

claims.  (*Id.* at PageID 2048.)  TX Direct then tried to debit the merchant for the transactions.

(*Id.*)  But the merchant's bank rejected TX Direct's debit attempt.  (*Id.*)  First Data next tried "to

pass the reject back to TX Direct," which First Data asserts is required under industry standards. (*Id.*)  But TX Direct blocked its bank account, which left First Data "holding the liability for the amount of the transactions."  (*Id.*)  TX Direct left the block in place for several months.  (*Id.*)

TX Direct describes a very different situation.  According to TX Direct, it believed that the merchant was engaging in money laundering.  (ECF No. 131-1 at PageID 3772–73; *see* ECF No. 131-2 at PageID 3803.)  TX Direct further asserts that because of limitations in First Data's systems, TX Direct could not stop the transactions.  (ECF No. 131-1 at PageID 3772–73; *see* ECF No. 131-2 at PageID 3803.)  TX Direct claims that it worked with the FBI on the matter and requested that First Data "hold all funds related to this merchant."  (ECF No. 131-1 at PageID 3772–73; *see* ECF No. 131-2 at PageID 3803.)  But First Data refused.  TX Direct explains that it cleared the hold on its account, and First Data was able to collect the debits.  (ECF No. 131-1 at PageID 3772–73; *see* ECF No. 131-2 at PageID 3803.)

In any event, according to Defendants, this event caused First Data to worry that TX Direct did not understand its role as a Wholesale ISO.  (ECF No. 125-2 at PageID 2048.)

## C.    New York Attorney General Proceeding

Lastly, during its annual review of TX Direct in late 2021, First Data found a New York Attorney General "proceeding" asserting that Ari Jay Cohen—the individual identified in First Data's records as the then-owner of TX Direct—committed deceptive business practices and fraud.  (ECF No. 131-1 at PageID 3776–77; *see* ECF No. 125-14 at PageID 2897–98.)  Because TX Direct failed to inform First Data about this proceeding, First Data sent a for-cause Notice of Termination of the Wholesale Agreement on September 13, 2021.  (ECF No. 131-1 at PageID 3777; *see* ECF No. 125-12.)  In response, TX Direct sent First Data documentation showing Mr. Cohen no longer owned TX Direct.  (ECF No. 131-1 at PageID 3778; *see* ECF No. 125-15.)

After that, First Data sent a Status of Notice of Termination dated November 24, 2021, in which

it informed TX Direct that the documentation had cured the default. (ECF No. 131-1 at PageID

3778–79; *see* ECF No. 125-15.) That Status of Notice of Termination also informed TX Direct

that First Data had "not yet determined whether it [would] renew the [Wholesale] Agreement

when the term [expired] April 30, 2022." (ECF No. 131-1 at PageID 3778–79; *see* ECF No.

125-15.)

The Court now turns to discuss the document central to this lawsuit—the 2022 Notice of

Non-Renewal.

## IV.    Notice of Non-Renewal

On January 28, 2022, First Data issued a Notice of Non-Renewal to TX Direct. (ECF

No. 125-23.) From the face of the Notice of Non-Renewal, only First Data sent it. (*Id.*) Indeed,

Wells Fargo's name does not appear on the Notice of Non-Renewal. (*Id.*) And the First Data

representative who signed the Notice did not indicate that he was signing on behalf of Wells

Fargo. (*Id.*) As will be discussed later in this Order, central to this dispute is whether the Notice

of Non-Renewal was effective even though only First Data sent it.

In the Notice of Non-Renewal, First Data explained that it believed "TX Direct has

exhibited limitations regarding [its] ability to perform [its] obligations and requirements as

defined within the [Wholesale Agreement] and Program Standards." (*Id.*) And the Notice

explained that the Wholesale Agreement would expire on April 30, 2022. (*Id.*) But the Notice

also stated that First Data was "not foreclosing the possibility of continuing its relationship with

TX Direct in another form." (*Id.*) And the Notice reminded TX Direct that, even after the

termination of the Wholesale Agreement, TX Direct had obligations it needed to perform as to its portfolio. [4]  (*Id.*)

## V.    Extensions and New Merchants

After First Data sent the Notice of Non-Renewal in January 2022, the parties began negotiating a new agreement—a Retail ISO Agreement ("Retail Agreement")—rather than another Wholesale Agreement.  (ECF No. 131-1 at PageID 3785.)  In short, under a Retail Agreement, First Data would assume more responsibilities (and presumably more income) and, in turn, TX Direct would have fewer (and earn less income).  (*See* ECF No. 125-7 at PageID 2344.)  Also TX Direct would add new merchants into a separate retail portfolio, rather than into its existing Wholesale Portfolio.  (ECF No. 131-1 at PageID 3786.)  But the Wholesale Agreement would continue to govern the merchants already in TX Direct's Wholesale Portfolio. (ECF No. 125-8 at PageID 2625.)

While negotiating the terms of the Retail Agreement, the Parties extended the non-renewal deadline of the Wholesale Agreement.  (ECF No. 131-1 at PageID 3786–87, 3791.)   But

---

[4] Also in January 2022, First Data completed an audit of TX Direct's compliance with the Wholesale Agreement and Program Standards.  (ECF No. 131-1 at PageID 3779; *see* ECF No. 125-16 at PageID 2908.)  First Data delivered the audit findings to TX Direct in February 2022. (ECF No. 131-1 at PageID 3780–81.)  These audit findings included mandatory remediation steps for TX Direct and gave it a "Needs Improvement" rating.  (*Id.*; ECF No. 125-17.)  After TX Direct provided First Data with certain documentation, First Data informed TX Direct on May 17, 2022, that First Data considered the remediation "closed."  (ECF No. 125-18.)  In that May 17, 2022, email however, First Data did not say that it cured the Notice of Non-Renewal. (*Id.*; ECF No. 131-1 at PageID 3782; ECF No. 125-7 at PageID 2411.)  In fact, the email does not even mention the Notice of Non-Renewal.  (ECF No. 125-18; ECF No. 131-1 at PageID 3782; ECF No. 125-7 at PageID 2411.)  And, in any event, Section 10.1 of the 2017 Amendment to the Wholesale Agreement, which contains the relevant non-renewal provision, does not allow TX Direct to cure a Notice of Non-Renewal.  (ECF No. 125-21 at PageID 2991; *see also* ECF No. 131-1 at PageID 3783.)  TX Direct did not rely on these facts in opposing Defendants' Motion for Summary Judgment, which is why the Court has summarized them in a footnote. (*See* ECF No. 131.)

when the Retail Agreement negotiations broke down in September 2022, First Data cut off TX Direct's ability to load new merchants through AccessOne.  (*Id.* at PageID 3791.)  The Court describes these facts in more detail below in the Ratification Section of this Order.

TX Direct continued to add new merchants to its Wholesale Portfolio, despite First Data's try to stop that practice.  TX Direct did this by using MIDs for dormant merchants and then changing the rest of the profile information to that of new merchants.  (*Id.* at PageID 3793–94; ECF No. 125-3 at PageID 2061.)  This allowed new merchants to process transactions on First Data's systems under MIDs assigned earlier to other merchants.[5]  But TX Direct and First Data never discussed TX Direct's plan to "recycle MIDs" and add new merchants in its Wholesale Portfolio.  (ECF No. 131-1 at PageID 3794–95; ECF No. 125-3 at PageID 2061–62.)  And TX Direct never asked First Data how it could provide the required Merchant Application Materials for the new merchants that TX Direct boarded using the recycled MIDs.  (ECF No. 131-1 at PageID 3794–95; ECF No. 125-3 at PageID 2061–62.)  According to Defendants, First Data learned of the MID recycling in October 2023.  (ECF No. 125-2 at PageID 2054; ECF No. 125-3 at PageID 2061.)  And, based on the recycling, Defendants sent TX Direct a for-cause Notice of Termination of the Wholesale Agreement on October 16, 2023.[6]  (*See* ECF No. 125-39.)

Now that the Court has set out the facts of the case, the Court will take up the Parties' position on whether the Court may consider certain summary judgment exhibits in deciding the

---

[5] Although TX Direct disputes that these actions violated the Wholesale Agreement and the Program Standards, TX Direct has not disputed that these actions occurred.  (*See* ECF No. 131-1 at PageID 3793–94.)

[6] Defendants maintain the position that the Notice of Non-Renewal from January 28, 2022, was effective.  They sent the October 2023 Notice of Termination in the event the Court disagreed. (ECF No. 125-39.)

Motion for Summary Judgment.  The Court has placed this discussion below, rather than above,

the Background Section so that the reader has context for the Court's evidentiary rulings.

## EVIDENTIARY ISSUES

In support of their Motion for Summary Judgment, Defendants included a statement of

undisputed facts with citations to the record.  (ECF No. 125-2.)  In turn, TX Direct responded to

each of Defendants' undisputed facts.  (*See* ECF No. 131-1.)  In many of its responses, TX

Direct asserted a hearsay objection for some of the Exhibits Defendants relied on.  In total, TX

Direct lodged hearsay objections to 16 of Defendants' Exhibits—Exhibits I, J, K, L, M, N, O, P,

Y, CC, DD, EE, FF, GG, HH, and JJ.  (*See* ECF Nos. 125-11 (Exh. I), 125-12 (Exh. J), 125-13

(Exh. K), 125-14 (Exh. L), 125-15 (Exh. M), 125-16 (Exh. N), 125-17 (Exh. O), 125-18 (Exh.

P), 125-27 (Exh. Y), 125-31 (Exh. CC), 125-32 (Exh. DD), 125-33 (Exh. EE), 125-34 (Exh. FF),

125-35 (Exh. GG), 125-36 (Exh. HH), and 125-38 (Exh. JJ).)  Besides providing a general

citation to Federal Rule of Evidence 802 TX Direct did not develop these hearsay objections

anywhere in its briefing.  In their Reply, Defendants responded to TX Direct's hearsay objections

and explained why the Exhibits are admissible.  (ECF No. 135 at PageID 3855.)  TX Direct has

not addressed any of Defendants' arguments about these Exhibits.

In responding to TX Direct's hearsay objections, Defendants grouped the disputed

Exhibits into three categories: (1) communications about First Data's Notice of Termination

dated September 13, 2021, requiring TX Direct to terminate certain merchants; (2)

communications about First Data's earlier issues with TX Direct and the audit results; and (3)

communications about the Retail Agreement and the Parties' extensions of the Wholesale

Agreement.  Having reviewed the Exhibits, the Court agrees with these groupings.  The first

category includes Exhibits I and J; the second category includes Exhibits K, L, M, N, O, and P;

and the third category includes Exhibits Y, CC, DD, EE, FF, and GG.  (*See* ECF No. 131-1.)
Exhibits HH and JJ are also in dispute, but the Court finds that they do not fit neatly into any
category.  (*See id.*)  The Court will address these two Exhibits last.

## I.      Category 1: Exhibits I and J

Defendants argue that Exhibits I and J, communications about the September 2021
Notice of Termination from First Data are not offered to prove the truth of the matter asserted.
In other words, Defendants do not offer these Exhibits to show that certain merchants in TX
Direct's portfolio had issues and needed to be terminated.  Rather, Defendants offer these
Exhibits to show the Parties' course of dealing—that is, TX Direct took direction from First Data
alone about such issues.  And upon review of the Exhibits, the Court agrees with First Data that
Exhibits I and J are admissible (as non-hearsay) to show the Parties' course of dealing.  The
Court therefore **OVERRULES** TX Direct's hearsay objection to Exhibits I and J.

## II.     Category 2: Exhibits K, L, M, N, O, and P

The Court now moves to the second category of Exhibits—communications about TX
Direct's audit results and issues as a Wholesale ISO.  Defendants argue that these emails
(Exhibits K, L, M, N, O, and P) show First Data's state of mind when it chose not to renew the
Wholesale Agreement.  (ECF No. 135 at PageID 3855.)  And upon review of these Exhibits and
Defendants' Motion for Summary Judgment, the Court finds that, to the extent First Data's state
of mind is at issue, Exhibits K, L, M, N, O, and P are admissible to show First Data's state of
mind relating to its decision not to renew the Wholesale Agreement and during the later Retail
Agreement negotiations.  And for reasons explained later, the Court finds that these Exhibits are
business records.  The Court therefore **OVERRULES** TX Direct's hearsay objections to
Exhibits K, L, M, N, O, and P.

III.    **Category 3: Exhibits Y, CC, DD, EE, FF, and GG**

The Court now turns to the final category of Exhibits—Exhibits Y, CC, DD, EE, FF, and

GG.  Defendants explain that they offer these Exhibits to show that the Parties had agreed to

extend the Wholesale Agreement during the negotiations of the Retail Agreement.  (ECF No.

135.)  And the Court agrees that this is the case for Exhibit Y.  (ECF No. 125-27.); *Hunter v.*

*Shield*, 550 F. Supp. 3d 500, 517 (S.D. Ohio 2021), *aff'd*, No. 21-3748, 2022 WL 2952583 (6th

Cir. July 26, 2022) ("Statements 'that constitute verbal acts—like the words of a contract—are

not hearsay.'" (citation omitted)).  The Court also finds that Exhibits CC, DD, EE, FF, and GG,

are not hearsay, given they show the Parties' negotiations and Defendants' voiding of the

extensions.  What is more, taken together, these five Exhibits show TX Direct and Defendants'

back and forth negotiations of the Retail Agreement.  Accordingly, TX Direct's statements in

these Exhibits are not hearsay because they are statements of the party-opponent.  *See* Fed. R.

Evid. 801(d)(2).  And Defendants' statements in these Exhibits are not hearsay either because

they are admissible to provide context for TX Direct's communications.  The Court therefore

**OVERRULES** TX Direct's hearsay objections to Exhibits Y, CC, DD, EE, FF, and GG.

IV.    **Other Objections**

Exhibits HH and JJ are also in dispute.  (*See* ECF No. 131-1.)  But neither of these

Exhibits is inadmissible hearsay.  Exhibit HH goes to the Parties' state of mind in executing the

August 2022 Wholesale Amendment and includes a party-opponent statement.  And because

Exhibit JJ contains statements made by TX Direct, it is not hearsay as a statement of the party-

opponent—Rule 801(d)(2).  (*See* ECF No. 125-38.)  The Court thus **OVERRULES** TX Direct's

objections to these Exhibits.

What is more, Defendants have argued that 15 of these 16 Exhibits—Exhibits I, J, K, L, M, N, O, P, Y, CC, DD, EE, FF, GG, and HH—are business records. To that end, Defendants included the Declaration of Erik Nicholson. (ECF No. 135-2.) First Data's parent company employs Mr. Nicholson as a senior vice president. (*Id.*) In this role, Mr. Nicholson oversees First Data's relationships with ISOs like TX Direct. (*Id.*) He is familiar with the Exhibits included with the Motion for Summary Judgment, and Mr. Nicholson is familiar with how First Data creates, maintains, and stores documents, including emails. (*Id.*) And in his Declaration, Mr. Nicholson states that Exhibits I, J, K, L, M, N, O, P, Y, CC, DD, EE, FF, GG, and HH were (1) "made at or near the time they were sent by someone with knowledge of the matters therein," (2) "maintained by First Data in the course of regularly conducted business activity," (3) "were made as a regular practice of that business activity," and (4) "are true and accurate representations of these documents as they are kept in the ordinary course of regularly conducted business activity." (*Id.*) Considering Mr. Nicholson's Declaration and the lack of argument from TX Direct on whether these Exhibits are business records, the Court finds that Exhibits I, J, K, L, M, N, O, P, Y, CC, DD, EE, FF, GG, and HH, are business records and therefore admissible. (*Id.*)

For the reasons stated above, the Court **OVERRULES** TX Direct's hearsay objections to Exhibits I, J, K, L, M, N, O, P, Y, CC, DD, EE, FF, GG, HH, and JJ.

Also in their statement of undisputed facts, Defendants included assertions related to the meaning of certain provisions of the Wholesale Agreement and Program Standards. (ECF No. 125-2.) For the most part, TX Direct agrees with Defendants' interpretation of the Wholesale Agreement and Program Standards. (*See generally* ECF No. 131-1.) But TX Direct objects to many of Defendants' undisputed facts about these contracts, arguing that contract interpretation

is a matter for the Court. (*See id.* at PageID 3767.)  The Court agrees that contract interpretation

is generally a question of law for the Court.  But, to the extent that the Parties agree on what

certain provisions of the Wholesale Agreement and Program Standards mean or require, the

Court will consider that here.  After all, the goal of contract interpretation is to effectuate the

Parties' intent.  And, in any event, the interpretations on which the Parties agree are consistent

with the Court's reading of the contracts.  The Court now addresses First Data's evidentiary

objections.

In support of its response in opposition to Defendants' Motion for Summary Judgment,

TX Direct relies on the Declaration of Crandall Quinn, TX Direct's Chief Financial Officer.

(*See* ECF No. 131-2.)  Defendants argue that this Declaration is a self-serving affidavit that

contains conclusory statements and legal conclusions, which cannot create a question of fact.

(*See* ECF No. 135 at PageID 3853.)

"Affidavits are, by their nature, self-serving."  *McKinney v. Hensen*, No. 1:23-CV-113,

2024 WL 1826358, at *2 (W.D. Mich. Apr. 26, 2024).  And "self-serving affidavits are not

impermissible."  *Salekin v. McDonough*, No. 3:21-CV-00107, 2023 WL 5538981, at *2 (M.D.

Tenn. Aug. 28, 2023), *aff'd*, No. 23-5849, 2024 WL 3221161 (6th Cir. June 28, 2024).  That

said, self-serving affidavits are an issue when overwhelming evidence in the record contradicts

the affidavit.  *See Hoffner v. Bradshaw*, 622 F.3d 487, 500 (6th Cir. 2010).  Self-serving

affidavits are also problematic when they contradict prior sworn testimony, are not based on

personal knowledge, or are conclusory.  *Salekin*, 2023 WL 5538981, at *2.

All the same, the Court finds that Ms. Quinn's Declaration is permissible here, and the

Court has considered the Declaration in deciding the Motion for Summary Judgment.  The

Declaration includes many factual statements based on Ms. Quinn's personal knowledge that do

15

not contradict prior sworn testimony.[7]  (*See* ECF No. 131-2.)  It is true that the Declaration

includes a few legal conclusions or factual assertions that contradict the copious record evidence.

(*Id.*)  But most of these assertions are not relevant to the Court's ruling on the Motion for

Summary Judgment.  As much as they are relevant, the Court addresses them in the opinion

below.

Now that the Court has addressed various evidentiary issues, the Court will explain the

relevant standard of review.

## LEGAL STANDARD

Courts grant summary judgment only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if "proof of that fact would establish

or refute an essential element of the cause of action or defense."  *Bruederle v. Louisville Metro*

*Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th

Cir. 1984)).  And courts construe all reasonable inferences in favor of the nonmoving party when

it considers a motion for summary judgment.  *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir.

2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party shows there is no genuine issue of material fact, the burden shifts to

the nonmoving party to set forth specific facts showing a triable issue of material fact.

*Matsushita*, 475 U.S. at 587.  In arguing that a genuine issue exists, "the nonmoving party must

present significant probative evidence that will reveal that there is more than some metaphysical

---

[7] The Court also **OVERRULES** Defendants' hearsay objections to Ms. Quinn's statements in
the Declaration.  (*See* ECF No. 135-3 at PageID 3878.)  In deciding this Motion for Summary
Judgment, the Court finds that Ms. Quinn's Declaration does not include inadmissible hearsay.

doubt as to the material facts." *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 667 (6th Cir.

2022) (internal quotations and citing references omitted). Put differently, "in the face of a

summary judgment motion, the nonmoving party cannot rest on its pleadings but must come

forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39

F.3d 1339, 1347 (6th Cir. 1994). Indeed, Federal Rule of Civil Procedure 56(c)(1)(A) requires

that the nonmoving party cite specific places in the record to show a genuine dispute of fact

exists. Even more, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Likewise, if the nonmoving party "fails to make a sufficient showing of an essential

element of his case on which he bears the burden of proof," then the moving party is entitled to

"judgment as a matter of law and summary judgment is proper." *Martinez v. Cracker Barrel Old*

*Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Chapman v. United Auto*

*Workers Loc. 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)). But if the Court finds there is

a genuine dispute over material facts, then it must deny summary judgment, and the case should

proceed to trial. *George v. Youngstown State Univ.,* 966 F.3d 446, 458 (6th Cir. 2020).

Now the Court turns to its analysis of Defendants' Motion.

## ANALYSIS

The Parties agree, and the Wholesale Agreement provides, that New York law applies

here. (ECF No. 125-6 at PageID 2313; *see* ECF No. 125-1 at PageID 2026; ECF No. 131 at

PageID 3737.) So the Court will look to New York law to evaluate the breach of contract claims

at issue in this Motion for Summary Judgment. And to prevail on a breach of contract claim

under New York law, the proponent of the claim must prove four elements: "(1) the existence of

an agreement between the plaintiff and defendant; (2) due performance of the contract by the

plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach."

*Clalit Health Servs. v. Israel Humanitarian Found.*, 385 F. Supp. 2d 392, 397 (S.D.N.Y. 2005)

(citation omitted).

At the core of its breach of contract claim, TX Direct alleges that Defendants breached

the Wholesale Agreement on September 19, 2022, when First Data cut off TX Direct's ability to

board new merchants using AccessOne.  (ECF No. 92 at PageID 959–60.)  Defendants move for

summary judgment on this claim.  And, in essence, Defendants argue that the Wholesale

Agreement had expired by September 19, 2022.  (*See* ECF No. 125-1.)  In support of this

position, Defendants argue that the Notice of Non-Renewal from January 28, 2022, was effective

and that their later actions did not ratify the Wholesale Agreement or otherwise revoke the

Notice of Non-Renewal.  (*Id.* at PageID 2027–35.)

The Court now turns to these issues.

**I.      Servicers**

**A.      Contract Language**

Section 10.1 of the 2017 Amendment to the Wholesale Agreement contains the non-

renewal language at issue.  (ECF No. 125-21 at PageID 2991.)

> 10.1 Initial Term.  The initial term of this processing agreement shall be thirteen
> (13) Processing Years commencing on the Effective Date of this Agreement and
> ending on April 30, 2020, unless terminated earlier as provided in this Section 10.
> The term of this Agreement shall automatically renew for successive terms of two
> (2) Processing Years unless either ISO or Servicers give written notice of non-
> renewal to the other at least ninety (90) days prior to the expiration of the then-
> current term.

(*Id.*)[8] A key question here is the meaning of "Servicers." On that issue, the Wholesale

Agreement provides, "[u]nder this Agreement, [First Data] and Bank will collectively be referred

to as 'SERVICERS'." (ECF No. 125-6 at PageID 2286.) But Section 12.13 of the Wholesale

Agreement, the construction section, provides that "the plural shall include the singular, and the

singular shall include the plural." (*Id.* at PageID 2313.)

Also, the 2017 Amendment includes Section 10.2, which is entitled "Termination by

Servicers." (ECF No. 125-21 at PageID 2991.) Rather than using the term "Servicers," Section

10.2 states that either "First Data or Bank may terminate this Agreement prior to its expiration

for cause upon prior written notice to ISO." (*Id.*) And so the language in the for-cause

termination provision and the non-renewal provision differ. (*Id.*) To be clear, the for-cause

termination provision provides that either First Data or the acquiring bank can terminate the

agreement, while the non-renewal provision provides that "Servicers" need to give a notice of

non-renewal. (*Id.*)

In the early stages of litigation, Defendants moved to dismiss this case, arguing that

"Servicers" meant either First Data or Wells Fargo. (ECF No. 28-1 at PageID 296.) Even

though Section 10.1 referred to "Servicers," Defendants claimed that either First Data or Wells

Fargo could provide notice of non-renewal. (*See id.*) In support of their position, Defendants

---

[8] In its Amended Complaint, TX Direct asserts that this language means that the Wholesale
Agreement's initial term continues until November 30, 2030, and so the Wholesale Agreement is
not expired. (ECF No. 92 at PageID 958.) In its Motion for Summary Judgment, Defendants
argue that this provision means that the initial term of the Wholesale Agreement ended April 30,
2020. (ECF No. 125-1 at PageID 2028.) TX Direct did not address Defendants' argument on
this point and has therefore, abandoned its position on this issue. (*See* ECF No 131.) In any
event, the Court agrees with Defendants' read of when the initial term ended. Indeed, the
provision states in plain language that the initial term would end on April 30, 2020. (ECF No.
125-21.) What is more, in the 2017 Amendment, the word "Agreement" is defined as the
"Wholesale Agreement." (*Id.*) And the Wholesale Agreement was executed in 2007. (*See* ECF
No. 125-6.)

pointed to the construction section of the Wholesale Agreement which said that the plural

includes the singular and the singular includes the plural. (*Id.*) TX Direct countered that the

plain language of the Wholesale Agreement defined "SERVICERS" as Wells Fargo and First

Data collectively and argued that this specific definition overrides the Wholesale Agreement's

general construction section. (ECF No. 29 at PageID 311.)

In ruling on the Motion to Dismiss, the Court found both TX Direct and Defendants'

interpretations to be reasonable. (ECF No. 51.) And, in finding TX Direct's interpretation

reasonable, the Court emphasized the differing language in the non-renewal provision and the

for-cause termination provision. (*Id.* at PageID 440–42.) Accordingly, the Court found "that

the term 'Servicers' in Section 10.1 of the Agreement [was] ambiguous in the context of the non-

renewal provision." (*Id.* at PageID 441.) And because courts should not resolve this sort of

ambiguity at the motion to dismiss stage, the Court denied Defendants' Motion to Dismiss. (*Id.*

at PageID 442.) This holding still stands, and the Court again finds that the term "Servicers" in

Section 10.1 is ambiguous when looking only at the language of the Wholesale Agreement and

the 2017 Amendment.[9]

### B.    Parties' Arguments

The case has now reached the summary judgment stage, and Defendants again argue that

the Notice of Non-Renewal was effective. And Defendants make two arguments for why this is

---

[9] The Court stands by its prior holding that Section 10.1 is ambiguous given the for-cause
termination clause in Section 10.2. Indeed, the natural question is: why does contractual
language between Section 10.1 and 10.2 differ? But, at the same time, one could view Section
10.2 as providing at least some support for the idea that "Servicers" in Section 10.1 refers to First
Data and Wells Fargo individually. Indeed, the fact that under Section 10.2 either servicer may
terminate the Wholesale Agreement shows that the Parties contemplated that the Wholesale
Agreement could end without both Wells Fargo and First Data agreeing. In other words, the end
of the Wholesale Agreement is not such a significant event that both Wells Fargo and First Data
needed to notify TX Direct.

the case. But this time around, Defendants' arguments are based on more than the language of the Wholesale Agreement and its 2017 Amendment.

### 1.    Agency Argument

As their first argument, Defendants maintain that First Data had actual authority to act on Wells Fargo's behalf in sending the Notice of Non-Renewal. (ECF No. 125-1 at PageID 2029–30.) In support of this argument, Defendants reference the "Clearing Agreement," which is an agreement that Wells Fargo and First Data Merchant Services Corporation ("First Data Corp.") entered in 2013. (*Id.*; *see* ECF No. 125-4.) The Clearing Agreement outlines First Data Corp. and Wells Fargo's duties as a processor and acquiring bank. (*See* ECF No. 125-4.) Potentially relevant here, Section 3.1 provides that "[f]or the term of this Agreement, [First Data Corp.] will apply the Credit Policy in connection with approval, disapproval or termination of Merchants, ISO/SPs and/or Agent Banks." (*Id.* at PageID 2076.) Furthermore, Section 3.13 provides: "[i]n connection with its Sponsorship role, [Wells Fargo] constitutes and appoints [First Data Corp.] as its true and lawful attorney-in-fact and agent … (i) to … ; (ii) to … ; and (iii) to take all other actions reasonably necessary or appropriate in connection with this Agreement." (*Id.* at PageID 2080–81.) And Defendants rely on these provisions of the Clearing Agreement to argue that "First Data did not need to consult Wells Fargo when deciding whether to renew an ISO agreement." (ECF No. 125-1 at PageID 2016.)

In sum, Defendants argue that "Wells Fargo bestowed actual authority on First Data under the Clearing Agreement to act on Wells Fargo's behalf when [] communicating with TX Direct regarding the Wholesale ISO Program, including when issuing a notice of non-renewal."[10]

---

[10] Relevant to this argument is Section 2.2 of the Clearing Agreement: "[First Data Corp.] will provide processing services to such Merchant, ISO/SP, or Agent Bank, … which will include, as applicable, Transaction authorization, credit research, security monitoring and recovery, debt

(*Id.* at PageID 2029–30.)  In the alternative, Defendants argue that, even if the Clearing

Agreement did not create such actual authority, "Wells Fargo's reliance on First Data to manage

the Wholesale ISO Program did."  (*Id.* at PageID 2030.)  And Defendants maintain that First

Data's actual authority existed even if TX Direct did not know that First Data was acting as

Wells Fargo's agent.  (*Id.* at PageID 2031.)

      TX Direct's response to Defendants' argument is two-fold.  As part of its response, TX

Direct argues that the Clearing Agreement did not give First Data actual authority to act on

behalf of Wells Fargo.  (ECF No. 131 at PageID 3747.)  TX Direct points out that the Clearing

Agreement is between Wells Fargo and First Data Merchant Services Corporation, not First Data

Merchant Services, LLC (the party in this lawsuit).  (*Id.*; *see* ECF No. 125-4 at PageID 2104.)

Defendants respond to this argument in their Reply and assert that First Data Merchant Services

Corporation became First Data Merchant Services, LLC in 2015.  (ECF No. 135 at PageID

3851.)  To support that point, Defendants include First Data Merchant Services LLC's Articles

of Conversion.  (ECF No. 135-1.)  TX Direct then filed a Surreply on this issue.  (ECF No. 136.)

In the Surreply, TX Direct argues (1) that it is unfair to introduce this Exhibit with the Reply and

(2) the Articles of Conversion are inadmissible hearsay as they lack proper authentication.  (*Id.* at

PageID 3882.)

      TX Direct also argues that, even if First Data had actual authority to act on behalf of

Wells Fargo, First Data did not indicate on the Notice of Non-Renewal that it was acting on

behalf of Wells Fargo which, according to TX Direct, renders the Notice of Non-Renewal

---

collection, customer service, Chargeback and retrieval processing, *communications*, accounting
and instructional and consulting services."  (ECF No. 125-4 at PageID 2069 (emphasis added).))
According to Defendants, this provision means that "First Data is responsible for providing
processing services to ISOs, including communications with ISOs."  (ECF No. 125-2 at PageID
2042.)

ineffective.  (ECF No. 131 at PageID 3747.)  TX Direct emphasizes that it did not know that

First Data was Wells Fargo's agent and that the Wholesale Agreement and Program Standards do

not contain any provision allowing First Data to act on behalf of Wells Fargo.  (*Id.*)  And TX

Direct argues that a notice meant to have legal effect, like a notice of non-renewal of a contract,

that is "issued solely in the agent's name without any reference to the principal or the agency

relationship, is properly construed as the agent's notice, not the principal's."  (*Id.* at PageID

3746.)

Now that the Court has set out the parties' agency arguments, the Court will summarize

Defendants' second argument for why the Notice of Non-Renewal was effective.

### 2.    Course of Performance Argument

In support of their position that the Notice of Non-Renewal was effective, Defendants

make an argument that is "separate and distinct" from their agency argument.  (ECF No. 125-1 at

PageID 2031.)  Defendants argue that the parties' course of performance confirms that First Data

acts on behalf of "Servicers."  (*Id.*)  The Court considers this to be an argument that, given the

Parties' course of performance, the Court should interpret the term "Servicers" in Section 10.1 to

mean either First Data or Wells Fargo.  (*Id.*)  After all, the construction provision of the

Wholesale Agreement states that "the plural shall include the singular, and the singular shall

include the plural."  (ECF No. 125-6 at PageID 2313.)  TX Direct does not respond to

Defendants' course of performance argument in any substantive way.

In the next Section, the Court interprets Section 10.1 of the 2017 Amendment.  In

interpreting this provision, the Court takes up the question of whether the parties' course of

performance resolves the meaning of "Servicers."  And, in the end, the Court finds, while

looking to the Parties' course of performance, that the Parties intended "Servicers" to mean

either First Data or Wells Fargo—in this case, First Data.  Accordingly, the Court finds that

under Section 10.1 of the 2017 Amendment only First Data needed to send the Notice of Non-

Renewal, meaning the Notice of Non-Renewal from January 28, 2022, was effective.

As the Court finds that only First Data needed to send the Notice, the Court need not

reach the Parties' arguments about whether First Data had actual authority to act on behalf of

Wells Fargo.  Likewise, the Court need not reach the arguments about the admissibility of the

Articles of Conversion or about whether TX Direct needed to know that First Data was acting as

Wells Fargo's agent.

### C.   Contract Interpretation and Extrinsic Evidence

In general, summary judgment is appropriate on a breach of contract claim only when the

contractual language is unambiguous.  *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d

123, 130 (S.D.N.Y. 2013).  This is because typically the interpretation of an ambiguous contract

is a question of fact for the factfinder, while the interpretation of an unambiguous contract is a

question of law.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  But there

are exceptions to this general rule.

Indeed, "the court may resolve ambiguity in contractual language as a matter of law if the

evidence presented about the parties' intended meaning [is] so one-sided that no reasonable

person could decide the contrary."  *Compagnie Financiere de CIC et de L'Union Europeenne v.

Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (citation omitted).

Likewise, courts may "grant summary judgment regarding the interpretation of ambiguous

language if the non-moving party fails to point to any relevant extrinsic evidence supporting that

party's interpretation of the language."  *Id.* (citation omitted).

24

Important to this case, extrinsic evidence relevant to interpreting the parties' intent includes evidence of the contracting parties' course of performance. *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010).  In fact, "[c]ourts have deemed parties' course of performance as the 'best evidence of the intent of the parties to a contract,' finding that such post-contract conduct is 'highly probative of [the parties'] state of mind at the time the contract was signed.'"  *Trireme Energy Holdings, Inc. v. RWE Renewables Ams., LLC*, 757 F. Supp. 3d 445, 487 (S.D.N.Y. 2024) (collecting cases).

As explained above, when looking only at the four corners of the contract, the word "Servicers" in Section 10.1 of the 2017 Amendment is ambiguous.  And an ambiguity in a contract is often a reason to deny summary judgment.  But here, Defendants have presented extrinsic evidence of the parties' course of performance, which the Court may consider since the term "Servicers" is ambiguous.  And, in the end, the Court finds that this evidence is so one-sided that no reasonable person could find that "Servicers" in Section 10.1 refers to First Data and Wells Fargo collectively.[11]  What is more, TX Direct has presented no extrinsic evidence to support its interpretation of "Servicers."  (*See* ECF No. 131.)

The Court will now cover the extrinsic evidence that Defendants have set forth.  And the Court begins with a 2021 Notice of Termination in which First Data asked TX Direct to terminate a merchant account.

 The Wholesale Agreement permits "SERVICERS" to require that TX Direct terminate a merchant account.  (ECF No. 125-6 at PageID 2295.)  As Section 4.2 of the Wholesale

---

[11] In discussing the term "Servicers," TX Direct writes in its response to Defendants' Motion for Summary Judgment that "Defendants have placed nothing into the summary judgment record to remove the ambiguity referenced by the Court."  (ECF No. 131 at PageID 3751.)  But this is simply not true.  As explained in this section, Defendants have put forth evidence of the Parties' course of performance that reveals the Parties' intended meaning of "Servicers."

Agreement states, "SERVICERS may at any time require that a Merchant relationship be terminated by ISO in accordance with the Merchant Agreement and SERVICERS may cease the provision of services to any such Merchant." (*Id.*) And in September 2021, First Data sent TX Direct a Notice of Termination that directed TX Direct to terminate certain merchant relationships. (ECF No. 131-1 at PageID 3770; ECF No. 125-12 at PageID 2852–53.) Wells Fargo did not sign the Notice. (ECF No. 131-1 at PageID 3771; *see* ECF No. 125-12 at PageID 2852–53.) And First Data did not specify in the Notice that it was acting on behalf of Wells Fargo. (ECF No. 131-1 at PageID 3771; *see* ECF No. 125-12 at PageID 2852–53.) Even so, rather than challenging First Data's demand as ineffective, TX Direct moved the identified merchants to another processor. (ECF No. 131-1 at PageID 3771–72.) And so, this exchange shows that TX Direct took direction from First Data only. The Court finds that this evidence supports the notion that the parities intended the term "Servicers" to mean either First Data or Wells Fargo.

Defendants offer other extrinsic evidence too. As Defendants correctly explain, the Wholesale Agreement provides that "SERVICERS" may perform periodic reviews and ongoing monitoring of TX Direct's merchant portfolio. (ECF No. 125-6 at PageID 2292.) And the Wholesale Agreement gave "SERVICERS" a right to audit TX Direct's operations. (*Id.* at PageID 2302.) To this end, First Data would review and monitor TX Direct's Wholesale Portfolio on its own, without involving Wells Fargo. (ECF No. 131-1 at PageID 3776.) Likewise, First Data alone would audit TX Direct's operations. (*Id.*) Put simply, although the Wholesale Agreement gave these rights to "SERVICERS," First Data exercised the rights alone, adding support to the view that the Parties intended the term "Servicers" to refer to First Data and Wells Fargo individually.

What is more, the Parties agree that, over the course of the Wholesale Agreement, TX Direct never spoke to Wells Fargo and never interacted with Wells Fargo. (ECF No. 131-1 at PageID 3761.) And this lack of communication with Wells Fargo suggests that TX Direct's position on the term "Servicers" is suspect. This is especially the case given the Wholesale Agreement's provision that "the plural shall include the singular, and the singular shall include the plural." (ECF No. 125-6 at PageID 2313.) Indeed, under TX Direct's view of "Servicers," Wells Fargo would have had to send TX Direct a notice of non-renewal even though Wells Fargo never communicated or interacted with TX Direct during the course of the Wholesale Agreement.

Above all, a piece of extrinsic evidence related directly to Section 10.1 supports the Court's interpretation of "Servicers." In January 2017, TX Direct sent a Notice of Non-Renewal to First Data. (*See* ECF No. 125-22.) To do so, TX Direct's CFO emailed Bob Kilgore, an employee of First Data. (*Id.*) That email states:

January 27, 2017

Re: Non-Auto Renewal of Contract

Bob Kilgore,

Per our contractual agreement Section 10.1, we do not want for our agreement to auto renew and would like to negotiate a new Exhibit A Pricing Schedule for our upcoming renewal of our agreement.

Please advise on next steps.

Sincerely,

[Signature of Crandall Quinn]

Crandall Quinn
Chief Financial Officer
ePaymentAmerica, a TX Direct Company
[Ms. Quinn's email address omitted]

(*Id.*)  TX Direct did not send this email to Wells Fargo, or even copy it on the correspondence. (ECF No. 131-1 at PageID 3784.)  And TX Direct did not otherwise notify Wells Fargo of its non-renewal decision.  (*Id.*)   In response to this email, TX Direct and First Data negotiated the 2017 Amendment to the Wholesale Agreement without input from Wells Fargo.  (*Id.*)  In fact, TX Direct did not negotiate or discuss the 2017 Amendment with anyone at Wells Fargo.  (*Id.*)

This 2017 Notice of Non-Renewal seals the deal for Defendants on their Motion for Summary Judgment.  Section 10.1 of the Wholesale Agreement provides: "The term of this Agreement shall automatically renew for successive terms of two (2) Processing Years unless ISO or SERVICERS give written notice to the other at least ninety (90) days prior to expiration of the then-current term."[12]  (ECF No. 125-6 at PageID 2306.)  And the fact that TX Direct sent the above email only to First Data shows the Parties' intent about what the term "Servicers" means.  And it shows that the Parties intended "Servicers" to refer to First Data and Wells Fargo individually.

---

[12] Because the 2017 Amendment was not in effect during the time relevant to this piece of extrinsic evidence, the extrinsic evidence technically relates to Section 10.1 of the initial Wholesale Agreement rather than the 2017 Amendment.  But, the relevant language of Section 10.1 is the same in the initial Wholesale Agreement and the 2017 Amendment.  (ECF No. 125-6 at PageID 2306; ECF No. 125-21 at PageID 2991.)  In its entirety, Section 10.1 of the initial Wholesale Agreement states:

> 10.1 Initial Term.  The initial term of this Agreement shall be five (5) Processing Years commencing on the Effective Date of this Agreement and ending on April 30, 2012 unless terminated earlier as provided in this Section 10.  The term of this Agreement shall automatically renew for successive terms of two (2) Processing Years unless ISO or SERVICERS give written notice to the other at least ninety (90) days prior to expiration of the then-current term.

(ECF No. 125-6 at PageID 2306.)

TX Direct disputes that it served a Notice of Non-Renewal in January 2017.  (ECF No. 131-1 at PageID 3784.)  And in disputing this, TX Direct asserts that First Data, through its agent Bob Kilgore, "instructed" TX Direct to send the email "as a pre-requisite to re-negotiating pricing."  (*Id.*)  But TX Direct's objection does not alter the Court's view of this communication.  If anything, TX Direct's objection here shows that it followed instruction from First Data alone as it relates to the non-renewal of its contract.  What is more, TX Direct's reasoning for why it sent the Notice of Non-Renewal does not change the Court's conclusion.  Indeed, if TX Direct was sending a Notice of Non-Renewal to renegotiate contract pricing on its Wholesale Agreement, it had every incentive to send that Notice to the right parties so that First Data would engage in a re-negotiation.  And it sent the Notice only to First Data.

And so, in reviewing the contractual language and the extrinsic evidence discussed above about the Parties' course of performance, the Court finds that the Parties intended for the term "Servicers" in Section 10.1 of the 2017 Amendment to mean either First Data or Wells Fargo.  No reasonable jury could find otherwise.  TX Direct has put forth no extrinsic evidence to support its view of the term "Servicers," and, as shown above, the extrinsic evidence put forth by Defendants is completely one-sided.  Besides, the Wholesale Agreement's construction provision provides that "the plural shall include the singular, and the singular shall include the plural." (ECF No. 125-6 at PageID 2313.)

Accordingly, only First Data needed to send the Notice of Non-Renewal.  And so First Data's Notice of Non-Renewal from January 28, 2022, was effective.  As a result of that Notice, on April 30, 2022, the Wholesale Agreement did not renew.  That said, the Parties did extend the life of the Wholesale Agreement for a couple of months.  And the Court now turns to that time

and assesses whether the Parties' actions during that time either ratified the Wholesale

Agreement or created an implied contract.

## II.    Ratification and Implied Contract

Defendants move for summary judgment on TX Direct's breach of contract claim,

maintaining both that the Notice of Non-Renewal was effective and that Defendants did not later

ratify the Wholesale Agreement.  In response to Defendants' second argument, TX Direct argues

in broad strokes that the Parties' conduct either ratified the agreement or created an implied

contract.  The Court now takes up the ratification and implied contract issues.

### A.    Ratification

"'Ratification' results when a party to a voidable contract accepts benefits flowing from

the contract, or remains silent, or acquiesces in contract for any considerable length of time after

he has opportunity to annul or void the contract."  *Prudential Ins. Co. of Am. v. BMC Indus.,*

*Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986) (citing *Smith v. Jones*, 351 N.Y.S.2d 802, 807

(N.Y. Civ. Ct. 1973)).  And, when ratification occurs, an "otherwise voidable and, as a result,

invalid contract is confirmed, and thereby made valid."  *Clark v. Buffalo Wire Works Co.*, 3 F.

Supp. 2d 366, 371 (W.D.N.Y. 1998) (citations omitted).  In other words, when "a party ratifies a

contract, it cannot succeed on defenses asserting that it should not be bound by the contract."

*LaRubInt Corp. v. Joint Stock Co. Studio Soyuzmultfilm*, No. 22-CV-04461 (HG), 2025 WL

1713120, at *4 (E.D.N.Y. June 19, 2025) (citation omitted).

The Court will now set out the undisputed facts relevant to the ratification issue.  And, as

the Court describes below, the facts show why a ratification argument does not work here.  After

TX Direct received the Notice of Non-Renewal on January 28, 2022, TX Direct and First Data

started negotiating a Retail Agreement.  (ECF No. 131-1 at PageID 3785.)  But the Parties

needed time to do this.  So, at TX Direct's request, First Data agreed to extend the Wholesale

Agreement's non-renewal date several times.[13]  (*Id.* at PageID 3786.)  These extensions

happened both in writing and orally.  (*Id.*)  And they provided the Parties time to negotiate the

Retail Agreement and were "for the purpose of boarding merchants without interruption" during

the negotiations.  (*Id.*)

To that end, the Parties agree that "[b]etween April 30, 2022[,] and September 19, 2022,

while the parties mutually agreed to extend the non-renewal period of the Wholesale Agreement

during negotiation of the retail ISO agreement, First Data allowed TX Direct to continue

boarding new merchants to its wholesale portfolio."  (*Id.* at PageID 3791.)  They agree that "[i]n

each extension letter, First Data specified that the purpose of the extensions was to allow parties

to negotiate the retail ISO agreement in good faith."  (*Id.* at PageID 3786–87.)  The Parties also

agree that each extension letter "warned TX Direct that First Data maintained the 'sole

discretion' to declare the extensions 'void and of no force or effect' if First Data determined TX

Direct was not engaging in good faith to execute the retail ISO agreement."[14]  (*Id.*)  And this is

---

[13] In her Declaration, Ms. Quinn writes "the parties never discussed or established any non-renewal period in connection with the January 28, 2022 letter, and TX Direct was never aware of any such purported non-renewal period prior to the advent of this litigation."  (ECF No. 131-2 at PageID 3803.)  But this statement confuses the Court given that TX Direct agreed with Defendants' statement of undisputed fact that "[b]etween April 30, 2022 and September 19, 2022, while the parties mutually agreed to extend the non-renewal period of the Wholesale Agreement during negotiation of the retail ISO agreement, First Data allowed TX Direct to continue boarding new merchants to its wholesale portfolio."  (ECF No. 131-1 at PageID 3791.)  The record shows that the Parties extended the Wholesale Agreement to negotiate the Retail Agreement and that First Data could void the extensions if First Data found that TX Direct was not engaging in good faith to execute the Retail Agreement.  (*See, e.g.*, ECF No. 125-9 at PageID 3005; ECF No. 125-29.)  Accordingly, the Court disregards Ms. Quinn's Declaration as much as it suggests there was not a non-renewal period.

[14] For example, one of the extension letters states:

The Final Extension shall automatically and immediately be void and of no force or effect if, at any time between the date of this letter and July 15, 2022, [First Data]

exactly what First Data did.  Once negotiations broke down, First Data voided the extensions.
The Court now turns to the specifics of those facts.

On July 13, 2022, First Data sent TX Direct a final draft of the Retail Agreement and
asked TX Direct to execute the agreement by July 15, 2022.  (*Id.* at PageID 3787; *see* ECF No.
125-31.)  Then, on August 8, 2022, TX Direct listed eight final issues for First Data's
consideration.  (ECF No. 131-1 at PageID 3788; *see* ECF No. 125-32.)  In turn, on September
12, 2022, First Data sent a revised final version of the Retail Agreement and requested that TX
Direct execute the agreement by September 16, 2022.  (ECF No. 131-1 at PageID 3788–89; *see*
ECF No. 125-33.)  The very next day, on September 13, 2022, TX Direct's CEO represented that
TX Direct "agreed to [First Data's] last proposal" and "in principle I believe we are done."  (ECF
No. 131-1 at PageID 3789–90; *see* ECF No. 125-34.)

Despite that statement, on September 16, 2022, counsel for TX Direct informed First
Data that TX Direct would not sign the Retail Agreement.  (ECF No. 131-1 at PageID 3790; *see*
ECF No. 125-35.)  In response, counsel for First Data reiterated that (1) the most recent version
of the Retail Agreement First Data sent was final; (2) First Data would not "entertain any more
revisions"; and (3) TX Direct's wholesale boarding would be cut off on September 19, 2022,
whether or not TX Direct signed the Retail Agreement.[15]  (ECF No. 131-1 at PageID 3790; ECF
No. 125-35.)  After all that, TX Direct did not sign the Retail Agreement.  (ECF No. 131-1 at

---

in its sole discretion determines that: (A) TX Direct has proposed material revisions
to the New Agreement: or (B) TX Direct has not engaged in good faith to finalize
and execute the New Agreement.

(ECF No. 125-29.)

[15] As a reminder, under the Retail Agreement, TX Direct would continue servicing its existing
Wholesale Portfolio merchants, but any new merchants would be added into TX Direct's retail
portfolio.

PageID 3791.)  And on September 19, 2022, First Data terminated TX Direct's ability to board

merchants with AccessOne.  (*Id.*)

When looking at these facts, Defendants did not ratify the Wholesale Agreement and TX

Direct's ratification argument does not fit.  Simply put, this is not a case in which First Data

accepted the benefits from a voidable contract, rather than voiding it.  Instead, it involves a valid

contract—the Wholesale Agreement—that First Data decided to not renew.  Then, after First

Data decided to not renew the Wholesale Agreement, the Parties mutually extended the non-

renewal date of the Wholesale Agreement to negotiate a new agreement.  (*See, e.g.*, ECF No.

125-29 at PageID 3005.)  And then when those negotiations broke down, Defendants voided the

extensions.  And the Wholesale Agreement expired.

The Wholesale Agreement extensions depended on TX Direct participating in good faith

negotiations of the Retail Agreement.  (*See, e.g.*, *id.*)  In other words, if TX Direct failed to

negotiate in good faith, the extensions were voidable.  But from April through September, during

the extended life of the Wholesale Agreement, TX Direct negotiated the terms of the Retail

Agreement with First Data in good faith.  (*See* ECF No. 125-8 at PageID 2639–41.)  So there

was no period during which the extensions were voidable, but, rather than voiding them, First

Data accepted the benefits under, acquiesced to, performed under, or affirmatively acknowledged

the Wholesale Agreement.  *See LaRubInt Corp.*, 2025 WL 1713120, at *4 (citation omitted).

Indeed, once TX Direct chose not to sign the final version of the Retail Agreement, First Data

informed TX Direct that its boarding capabilities would be cut off.  (ECF No. 131-1 at PageID

3791; *see* ECF No. 131-35.)  Put differently, once the extensions became voidable, First Data

voided them and the Wholesale Agreement expired.

And no reasonable factfinder could find otherwise.  Indeed, TX Direct's ratification

argument is bare and mainly just references the Court's prior Order on the Motion to Dismiss.

As TX Direct writes:

> [I]n its Order, on the issue of ratification of the Wholesale Agreement the Court
> ruled that "[e]ven if Defendants told Plaintiff that the Agreement did not renew,
> Defendants' conduct – allowing the onboarding of new merchants –entering into
> extensions of the Agreement and signing the August Amendment – conflict with
> that statement."  *Order*, Dkt. No. 51, p. 12.   Even with the assertion of 115
> summary judgment "facts", [*sic*] Defendants have done nothing that would change
> the Court's analysis of this issue.  Accordingly, the issue of ratification was, and
> remains, a question of fact to be determined at trial.

(ECF No. 131 at PageID 3750–51.)[16]

But TX Direct cannot create a genuine dispute of material fact by merely pointing to the

Court's Order on the earlier Motion to Dismiss.  Of course motions to dismiss are evaluated

under a different standard of review than a motion for summary judgment.  Indeed, courts accept

as true well-plead allegations when deciding motions to dismiss.  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (citation

omitted)).  And when reviewing a motion to dismiss, the ruling court generally restricts its

review to the face of the complaint.  *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir.

2022).  But the rules are different for evaluating a motion for summary judgment.  *See* Fed. R.

Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by: (A) citing to particular parts of materials in the record.").

---

[16] If the Court's Order on the Motion to Dismiss suggested that the Parties' agreement to extend
the Wholesale Agreement could have somehow renewed the Wholesale Agreement, this is not
the Court's current position for the reasons discussed in this Section and the following Section
on TX Direct's implied contract argument.

When ruling on the Motion to Dismiss, the Court did not have the benefit of the record or undisputed facts it now has.  For example the Parties now agree that from April 30, 2022, to September 19, 2022, they extended their Wholesale Agreement while they negotiated a Retail Agreement.  (ECF No. 131-1 at PageID 3791; *see* ECF No. 125-8 at PageID 2639–41.)[17]  And although TX Direct boarded new merchants and signed an amendment to the Wholesale Agreement during that time,[18] that was all while the Wholesale Agreement was validly extended and while they negotiated a new Retail Agreement in good faith.  (ECF No. 131-1 at PageID 3793; *see* ECF No. 125-8 at PageID 2639–41.)  Furthermore, once those negotiations broke down, First Data informed TX Direct that its boarding capabilities would be cut off—showing that once the extensions became voidable, First Data voided them.  (ECF No. 131-1 at PageID 3791; *see* ECF No. 125-35; ECF No. 125-8 at PageID 2656.)  Based on these uncontroverted facts, no reasonable factfinder could find that Defendants ratified the Wholesale Agreement.[19]

---

[17] The deposition testimony cited here does not precisely state that the Wholesale Agreement was extended through September 19, 2022.  (*See* ECF No. 125-8 at PageID 2639–41.)  And the last written extension in the record extended the Wholesale Agreement through July 15, 2022.  (*See* ECF No. 125-29.)  But TX Direct's deposition testimony indicates that the Wholesale Agreement was extended as long as they continued to negotiate over the Retail Agreement.  (*Id.*)  And those negotiations took place through mid-September 2022.  (*See* ECF No. 125-35.)  And, for all that, in its response to the Statement of Undisputed Facts, TX Direct agreed that the Parties extended the Wholesale Agreement through September 19, 2022.  (ECF No. 131-1 at PageID 3791.)

[18] Besides referencing the Court's earlier order, TX Direct has not made arguments based on the August 2022 Amendment to the Wholesale Agreement ("August Amendment").  (*See* ECF No. 131.)  In fact, the August Amendment is not in the summary judgment record.  In any event, the Parties now agree that the August Amendment did not extend the term of the Wholesale Agreement.  (ECF No. 131-1 at PageID 3792.)  The Parties also agree that the August Amendment was executed while the Parties mutually agreed to extend the Wholesale Agreement.  (*Id.* at PageID 3793.)  Accordingly, no reasonable factfinder could find that the August Amendment renewed or ratified the Wholesale Agreement.

[19] If there is anything in the record that contradicts these facts, TX Direct has not pointed it out to the Court.  (*See* ECF No. 131-1 at PageID 3791–93.)

As a final point here, even if TX Direct intends to claim with its ratification argument that Defendants' actions after January 2022 somehow voided, revoked, or withdrew the January 2022 Notice of Non-Renewal, this argument fails. For starters, TX Direct has cited no legal authority on this issue or made this argument at the summary judgment stage. What is more, Section 10.1 of the 2017 Amendment does not provide any way for TX Direct to cure a notice of non-renewal or for Defendants to revoke a notice of non-renewal. But, even if the Court puts those concerns aside, no reasonable factfinder could find that any of Defendants' actions or words revoked the January 2022 Notice of Non-Renewal. Indeed, the Court has seen no evidence with which a reasonable factfinder could find that Defendants withdrew the Notice of Non-Renewal by either their actions or words.[20]   And the fact that the Parties mutually extended the non-renewal date of the Wholesale Agreement to negotiate a new, different agreement belies any claim that Defendants revoked the January 2022 Notice of Non-Renewal.

---

[20] The facts surrounding the January 2022 audit, the February 2022 remediation steps, and the May 17, 2022, email do not alter the Court's view here. As described in Footnote 4 of this Order, the May 2022 email, which informed TX Direct that the remediation was "closed," did not refer to the Notice of Non-Renewal. In fact, TX Direct's CFO admitted in her deposition that (1) the May 2022 email came from a different department of First Data than the Notice of Non-Renewal and (2) because of that, the May 2022 email would not have informed TX Direct that First Data was withdrawing the Notice of Non-Renewal. (ECF No. 125-7 at PageID 2411.) And, for all that, it makes sense that First Data would keep TX Direct informed about the audit and remediation status even after sending TX Direct the Notice of Non-Renewal. Remember, given the Parties' mutual extensions of the Wholesale Agreement, the Wholesale Agreement still governed the Parties' relationship during May 2022. And even after the signing of the Retail Agreement, the Wholesale Agreement would continue to govern the merchants in TX Direct's portfolio. And still TX Direct makes no argument based on this Audit in its response to Defendants' Motion for Summary Judgment. In fact, TX Direct goes further and argues that the May 17, 2022, email and the documents about the audit are inadmissible hearsay.

### B.    Implied Contract

TX Direct also briefly argues that an implied contract arose between the Parties.[21]  But

this argument fails.  "Under New York law, *absent a written agreement between the parties*, 'a

contract may be implied where inferences may be drawn from the facts and circumstances of the

case and the intention of the parties as indicated by their conduct.'"  *Bear Stearns Inv. Prods.,*

*Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 615 (S.D.N.Y.2009) (emphasis added)

(quoting *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y.1998)).

This means that "a contract cannot be implied *in fact* where the facts are inconsistent with its

existence … or where there is an express contract covering the subject-matter involved."  *Bader*

*v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 413 (S.D.N.Y. 2011) (citing *Ludemann*

*Elec., Inc. v. Dickran*, 903 N.Y.S.2d 532, 534 (2d Dep't 2010)).  But "when an agreement

expires by its terms, if, without more, the parties continue to perform as theretofore, an

implication arises that they have mutually assented to a new contract containing the same

---

[21] TX Direct's entire argument on this point is as follows:

> Further, also in its Order, the Court determined that even if it did not find that an
> agreement existed, "the Court would likely find that the Parties' continued
> extensions and onboarding of merchants would suggest an implied contract."
> *Order*, Dkt. No. 51, p. 13.  As with the points above, Defendants' litany of
> purported "facts" does nothing to change the Court's inclination in this regard.
> Instead, many of Defendants' facts actually tend to support a finding of an implied
> contract.

(ECF No. 131 at PageID 3751.)  But as described in the Ratification Section above, TX Direct
cannot create a genuine dispute of material fact by just pointing to the Court's Order on the
Motion to Dismiss.  Important to the implied contract argument, when ruling on the Motion to
Dismiss, the Court was under the impression that the extensions of the Wholesale Agreement
ended in July and that the Parties continued to operate from July to September 2022 without
extensions in place.  (*See* ECF No. 24 at PageID 183.)  But the Parties now agree that this is not
the case.  Indeed, the Parties now agree that the extensions carried into September 2022 and were
in place at the time of the August 2022 Amendment.  (ECF No. 131-1 at PageID 3791.)

provisions as the old." *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946); *see also*

*Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 238 (S.D.N.Y. 2019).

With this law in mind, no reasonable factfinder could find that an implied contract arose

between April 2022 and September 2022. As described above, implied contracts can arise when

a contract has ended but the Parties continue to operate under its terms. But that is not what

happened here. The Parties agree that, between April 30, 2022, and September 19, 2022, they

extended the Wholesale Agreement while they negotiated the Retail Agreement. (ECF No. 131-

1 at PageID 3791.) And so the Parties were still operating under an express agreement during

those months. Accordingly, the Parties' conduct during those months could not have given rise

to an implied contract. *See Bader,* 773 F. Supp. 2d at 413. As a result, when First Data cut off

the boarding portal on September 19, 2022, it was not breaching an implied contract. Given the

undisputed nature of the facts here, no reasonable factfinder could find otherwise.

The Court now turns to arguments about the implied covenant of good faith and fair

dealing.

### III.    Breach of Covenant of Good Faith and Fair Dealing

"New York law provides that a covenant of good faith and fair dealing is included in

every contract." *Mancini v. UBS AG, New York Branch*, 757 F. Supp. 3d 571, 578 (S.D.N.Y.

2024) (citation omitted). And "[t]his covenant embraces a pledge that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract." *Polcom USA, LLC v. Affiliated FM Ins. Co.*, 551 F. Supp. 3d

290, 297 (S.D.N.Y. 2021).

In its response to Defendants' Motion for Summary Judgment, TX Direct argues in

cursory fashion that Defendants have breached the implied covenant of good faith and fair

dealing.  (*See* ECF No. 131-1 at PageID 3750.)  Defendants address this argument in their Reply, writing "TX Direct makes a passing reference to the implied covenant of good faith and fair dealing, but TX Direct did not allege any such claim in its Amended Complaint, nor has it ever argued one previously.  This argument has been waived and should be ignored."  (ECF No. 135 at PageID 3854.)

Upon review of the Amended Complaint, the Court agrees with Defendants.  TX Direct did not bring a claim for a breach of the implied covenant of good faith and fair dealing.  (*See* ECF No. 92.)  In fact, the Amended Complaint includes a single count against Defendants.[22] (*See id.*)  And that claim is for breach of contract, alleging that Defendants breached the Wholesale Agreement.  (*See id.* at PageID 959.)

In any event, the Court has seen no evidence with which a reasonable factfinder could conclude that Defendants breached the implied covenant of good faith and fair dealing.  TX Direct's argument on this point boils down to this.

> Furthermore, the implied covenant of good faith and fair dealing is part of contracts under New York law, requiring that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  *Singh v. City of New York*, 40 N.Y.3d 138, 145, 217 N.E.3d 1, 5, *reargument denied*, 40 N.Y.3d 975, 219 N.E.3d 362 (2023); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933).  Factual disputes surrounding First Data's conduct, including the disputed basis for the non-renewal and termination notices, and its actions during negotiations for a new agreement, raise genuine issues as to whether First Data breached this implied covenant.

(*See* ECF No. 131 at PageID 3750.)

---

[22] The Court does note that at the very beginning of the Amended Complaint TX Direct briefly asserts that Defendants' actions breached the implied covenant of good faith and fair dealing.  (ECF No. 92 at PageID 939.)  But TX Direct only mentions it on the first page of the Amended Complaint.  (*Id.*)  Indeed, there is no count in the Amended Complaint bringing a claim for any breach of the implied covenant of good faith and fair dealing.  (*Id.*)

But the Court is unaware of any factual disputes about the reasons why Defendants sent

TX Direct the September 2021 Notice of Termination.  (*See* ECF No. 131-1 at PageID 3777.)

And remember, Defendants allowed TX Direct to cure the September 2021 Notice of

Termination.  (*Id.* at PageID 3778–79.)   TX Direct also fails to clarify how the reasons behind

the January 28, 2022, Notice of Non-Renewal are relevant.  In fact, Defendants needed no reason

to send a notice of non-renewal.  (ECF No. 125-21 at PageID 2991.)

Moreover, TX Direct cites nothing in the record to support its argument here that there

are factual disputes on these issues.[23]  (*See* ECF No. 131 at PageID 3750.)  Likewise, TX Direct

has not argued, explained, or cited to the record to show how the negotiations of the Retail

Agreement breached the implied covenant of good faith and fair dealing.[24]  (*See id.*)

Accordingly, no reasonable factfinder could find that Defendants breached the implied covenant

of good faith and fair dealing.

The Court now turns to the question of damages.

## IV.    Damages

Defendants also maintain that they are entitled to summary judgment because Plaintiff

cannot prove damages.  And this may be a valid point given the only piece of evidence in the

record about Plaintiff's damages is an expert report of Mr. Chad Salsbery [25] and there is currently

a *Daubert* motion pending about this report.[26]  (*See* ECF No. 124.)

---

[23] In fact, TX Direct does not cite the record in this argument.

[24] In any event, "[w]here a contract allows one party to [exercise a contractual right] in its 'sole discretion' and 'for any reason whatsoever' the covenant of good faith and fair dealing cannot serve to negate that provision."  *Mancini v. UBS AG, New York Branch*, 757 F. Supp. 3d 571, 579 (S.D.N.Y. 2024) (citation omitted).

[25] Mr. Salsbery wrote two reports.  But Mr. Salsbery's "Reply Report" has been stricken from the record.  (*See* ECF No. 154.)

[26] The Court also notes that Mr. Salsbery's report is not part of the summary judgment record.

But the Court need not reach Defendants' argument that TX Direct cannot prove damages. As a reminder, TX Direct sued Defendants for breach of contract, alleging that Defendants breached the Wholesale Agreement when First Data cut off the boarding portal and stopped allowing TX Direct to board new merchants. (ECF No. 92 at PageID 959–60.) But, for the reasons described above, no reasonable factfinder could find that cutting off the boarding portal was a breach of the Wholesale Agreement. Indeed, as thoroughly discussed above, no reasonable factfinder could find that the January 2022 Notice of Non-Renewal was ineffective. And no reasonable factfinder could find that the Parties' actions between April 2022 and September 2022 ratified the contract, revoked the Notice of Non-Renewal, or gave rise to an implied contract. Accordingly, no reasonable factfinder could find that Defendants breached the Wholesale Agreement by shutting off the AccessOne boarding, given the Wholesale Agreement had expired by that time. Thus, the damages question is irrelevant.

As a final point here, according to Mr. Salsbery's report, Defendants have not paid TX Direct residuals for many merchants that it boarded after the September 19, 2022, cutoff date. (*See* ECF No. 124-5 at PageID 1648.) And Mr. Salsbery estimates that these unpaid residuals total $325,243. (*Id.*) But TX Direct has not sued for these residuals in this lawsuit or alleged any breach of contract claim over these residuals.[27] (*See* ECF No. 92.) Likewise, TX Direct has made no argument in its response to Defendants' Motion for Summary Judgment or allegation in its Amended Complaint that, even if the Wholesale Agreement expired by September 19, 2022, Defendants still needed to pay TX Direct for the merchants boarded after September 19, 2022.[28]

_____

[27] TX Direct did not allege in its Amended Complaint that the failure to pay these residuals was a breach of the Wholesale Agreement or any other contract. (ECF No. 92.) Rather in both its Amended Complaint and Motion for Summary Judgment, TX Direct has framed the recycling of the MIDs as an effort to mitigate its damages. (*Id.*; ECF No. 131.)
[28] Under its Breach of Contract count in its Amended Complaint, TX Direct asserts:

(*Id.* at PageID 959–60; ECF No. 131.)  And TX Direct has not argued or alleged that it had any right to board merchants after the Wholesale Agreement expired.  (ECF No. 92; ECF No. 131.)

Rather, TX Direct's entire theory of the case is that the Wholesale Agreement is an unexpired contract (either because it was renewed or ratified)[29] and so cutting off the boarding portal, and the actions incident to cutting off the portal, breached the Wholesale Agreement. (*See* ECF No. 92 at PageID 959–60; ECF No. 131.)   But, as described above, no reasonable

---

65.  Plaintiff incorporates and restates by reference the allegations contained in the foregoing paragraphs of this First Amended Complaint as if fully set forth below.

66.  The (WISO) Processing Agreement is a valid, enforceable, *and unexpired contract* among TX Direct, FDMS, and Wells Fargo.

67.  TX Direct performed all obligations and conditions required by the (WISO) Processing Agreement.  The Servicers have not.

68.  The Servicers have materially breached the (WISO) Processing Agreement. *On September 19, 2022, the Servicers abruptly cut off TX Direct's access to the Boarding Portal.  In so doing*, the Servicers are prohibiting TX Direct from (i) completing applications and agreements for new merchants, (ii) paying the Minimum Fees to the Servicers, and (iii) complying with its other obligations under the (WISO) Processing Agreement.   In addition, the Servicers are failing and refusing to comply with the Servicers' obligation under the (WISO) Processing Agreement.   TX Direct was left without a processor with whom to board new merchants.

69.  As a result, despite the fact that TX Direct has partially mitigated its damages by assigning unallocated MIDs to new merchants, TX Direct has suffered, and continues to suffer, significant long-term actual, consequential, and other damage. TX Direct is entitled to its actual, consequential, and other damages from the Servicers in an amount to be proven at trial.

(ECF No. 92 at PageID 959–60 (emphasis added).)
[29] And TX Direct's arguments and allegations about ratification and a potential implied contract focus on the time before September 19, 2022.  (ECF Nos. 92, 131.)  Indeed, TX Direct's arguments about these issues refer to the Court's Order on the Motion to Dismiss, which was addressing TX Direct's allegations about the time before September 19, 2022.  (ECF No. 131 at PageID 131 at PageID 3751; *see* ECF No. 24.)

factfinder could find in TX Direct's favor on these issues, given no reasonable jury could find

that the Wholesale Agreement was an unexpired contract. So TX Direct has no claim for these

residuals in this lawsuit. And, as described more below, some fact questions remain about the

boarding of new merchants after September 19, 2022. But for reasons best known to TX Direct,

it did not bring a separate claim for these residuals. Given the requirements and the vetting

process for boarding new merchants set forth in Wholesale Agreement and Program Standards,

perhaps TX Direct had good reason not to assert such a claim.

The Court will now turn to assess whether Defendants are entitled to summary judgment

on their breach of contract counterclaim.

## V.    Defendants' Breach of Contract Counterclaim

As a refresher, to succeed on a breach of contract claim under New York law, the party

bringing the claim must prove "(1) the existence of an agreement between the plaintiff and

defendant; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the

defendant; and (4) damages resulting from the breach." *Clalit Health Servs. v. Israel

Humanitarian Found.*, 385 F. Supp. 2d 392, 397 (S.D.N.Y. 2005) (citation omitted).

As for Defendants' counterclaim, the Court finds that questions remain on these

elements. For starters, Defendants claim that "TX Direct breached the Wholesale Agreement

and Program Standards when it recycled MIDs without sending the new merchants' associated

Merchant Application Materials to First Data." (ECF No. 125-1 at PageID 2037.) In other

words, Defendants claim that certain actions TX Direct took after the expiration of the

Wholesale Agreement breached the Wholesale Agreement and Program Standards. But

Defendants do not explain how this is possible. Upon the Court's own review of the Wholesale

Agreement, it believes that Section 10.5(b) is relevant to this question. (*See* ECF No. 125-6 at

PageID 2308–09.)  But the Parties have offered no argument on this point, and the Court declines

to decide sua sponte which provisions of the Wholesale Agreement and Program Standards

survived the expiration of the Wholesale Agreement.

Furthermore, questions of fact remain.  Indeed, the Court is puzzled about how TX Direct

added merchants for an entire year before Defendants took any action.  And the Court has

questions about Defendants' claim for damages.  Defendants write in their Motion for Summary

Judgment that "[b]y breaching the Program Standards, TX Direct has forfeited all residual

payments currently withheld by First Data for the recycled merchants, and Defendants are

entitled to withhold these residuals as damages."  (ECF No. 125-1 at PageID 2039.)  But, given

Defendants are already in possession of these residuals, it is unclear at this stage how Defendants

can claim these residuals as damages.

Accordingly, for the reasons above, the Court **DENIES** Defendants' Motion for

Summary Judgment on the breach of contract counterclaim.

## CONCLUSION

For the reasons explained above, the Court **GRANTS** in **PART** and **DENIES** in **PART**

Defendants' Motion for Summary Judgment.  To be clear, the Court **GRANTS** Defendants'

Motion for Summary Judgment on TX Direct's breach of contract claim, and the Court **DENIES**

Defendants' Motion for Summary Judgment on Defendants' breach of contract counterclaim.

**SO ORDERED**, this 22nd day of July, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE